**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GLOBAL MATERIAL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.:  12-cv-01851 |
| | ) | |
| DAZHENG METAL FIBRE CO., LTD et al., | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants' renewed motion to dismiss Plaintiff's first amended complaint [128] and Plaintiff's motion for leave to file instanter a surreply in opposition to the motion [131].  For the reasons stated below, Defendants' motion to dismiss [128] is granted in part and denied in part, without prejudice, and Plaintiff's motion for leave to file instanter a surreply [131] is denied.  Plaintiff may file an amended complaint within 21 days of this order. This matter is set for status on 4/17/2014 at 9:00 a.m.

**I.      Background**

**A.      Facts**

Because this matter is before the Court on a motion to dismiss, the Court takes as true all factual allegations in the amended complaint and draws all reasonable inferences in favor of Plaintiff.  *E.g.*, *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Plaintiff Global Material Technologies ("GMT") is a New York corporation with its principal place of business in Illinois and various facilities and subsidiaries around the globe. Through a holding company organized under Delaware law, GMT owns a 25% stake in Defendant Dazheng Metal Fibre Co., Ltd. ("DNZ"), a Chinese corporation that, like GMT,

1

produces and sells metallic wool products. From 1996 to 2009, GMT was DNZ's primary customer, accounting for 75-90% of DNZ's overall sales. In 2003, GMT transferred the responsibility for manufacturing its consumer steel wool to DNZ's production facility in Zhuhai, China. In 2006, with the support of its largest customer, GMT shut down its Chicago plant and shifted 100% of the production of its largest customer's products to DNZ's manufacturing facilities in China. GMT continued to outsource production to DNZ through 2007, rendering it "increasingly dependent upon DNZ." At the peak of the parties' relationship, GMT and DNZ transacted more than $1,000,000 per month in sales.

GMT expressly alleges that its relationship with DNZ was "arms-length." However, GMT also alleges that the relationship was "unique," and many of GMT's allegations suggest that the relationship was close. GMT allowed select DNZ employees to conduct business through e-mail addresses incorporating GMT's domain name and permitted DNZ to export products from China directly to customers that had submitted orders with GMT. Additionally, "certain shareholders" held a "common ownership interest" in both companies. GMT's president, Norman Soep, "through GMT held an ownership interest in DNZ" and attended and actively participated in meetings held by DNZ's board of directors. Soep also was in contact with DNZ's president, Defendant Dong Jue Min, who was primarily responsible for DNZ's pricing, terms, production, quality, and day-to-day operations. Over the course of the parties' decade-plus relationship, DNZ became familiar with GMT's internal operations and competitive pricing and economic strategies. DNZ also became privy to sensitive information about GMT's customers, such as their identities, contact information, preferred product specifications, and ordering habits. GMT alleges that the information pertaining to its internal operating procedures and customers was developed or amassed at great expense and is "unique, confidential, and

proprietary" to GMT and its employees.  To that end, GMT allows only "select employees access to" the information and "protects [ ] its confidential information electronically via an elaborate computer access system that incorporates various safeguards" like login IDs and passwords.  Nonetheless, GMT "voluntarily supplied its confidential information to DNZ in good faith to further both companies' economic interests," "with the explicit understanding that DNZ would not provide that information to third-parties or use it in any manner inconsistent with GMT's business interests."  Some of the information was conveyed directly to "DNZ's board of directors and shareholders, including Dong Jue Min," during "confidential discussions with GMT's management" and DNZ board meetings attended by Soep.

Eventually the parties' relationship turned sour.  During 2007 and 2008, DNZ refused to timely manufacture certain fibers and consumer products for GMT, disregarded GMT's purchase orders, and shipped more than 750,000 pounds of rusted metallic fibers to GMT's customers. Many of GMT's customers complained, and GMT in turn relayed numerous quality claims to DNZ.  DNZ "infrequently acknowledged and more often rejected most quality claims." GMT was forced to manufacture some of the items that DNZ refused to ship, at a substantial loss.  In November 2007, GMT also lost as much as 50% of its business from Homax, Inc., a U.S.-based corporation to which GMT was the exclusive supplier of consumer steel wool products.  Despite being promptly notified about the rusty fibers and agreeing to pay for their sorting and return, DNZ did not credit GMT for the defective goods.  GMT was able to salvage approximately 484,000 pounds of the rusted fibers and returned the remainder to DNZ at its own expense.  DNZ also shipped to GMT more than 1.3 million pounds of consumer products that GMT did not order, and refused to stop doing so despite GMT's protests.  GMT was able to sell some of the

unordered goods but has spent more than $150,000 to store the remaining 291,000 pounds' worth.

"In March 2009, DNZ informed GMT that DNZ would seek additional metallic fiber and consumer product business outside of China, using whatever means at its disposal to gain market share." DNZ, acting through Dong Jue Min or pursuant to his orders, also spurned GMT's repeated requests – made in e-mails, board meetings, and personal visits from GMT executives – for more competitive pricing. Instead, DNZ offered GMT a pricing formula that failed to take into account market conditions, which GMT alleges put it "at a competitive disadvantage with other Chinese suppliers of metallic fibers and consumer products." GMT alleges that DNZ took this course of action in spite of its "confidential knowledge of GMT's pricing strategies and its understanding of the baseline price GMT could afford to sell its various products without incurring loss."

Unbeknownst to GMT, DNZ in 2009 began using the information that it had gleaned about GMT's operations and customers to undercut GMT's prices and sell to GMT's customers, both directly and through one or more DNZ-owned subsidiaries. Specifically, GMT alleges that Dong Jue Min supplied GMT's confidential information to DNZ's "exclusively" owned subsidiary (and Defendant) Tru Group, which exploited and misused that information to gain a competitive advantage over GMT. DNZ, primarily acting through Tru Group, offered other customers (but not GMT) a "market driven" pricing scheme that resulted in prices that DNZ knew GMT could not compete with. GMT further alleges that DNZ and Tru Group aimed to erode GMT's customer base and market position and, ultimately, drive GMT out of business. These efforts, which remain ongoing, have met with some success; GMT has lost several of its

largest customers and also has lost market position in Central and South America and Asia. GMT and DNZ no longer transact business together.

From 2009 to 2011, GMT, which was unaware of the origins and ownership of Tru Group, questioned Dong Jue Min about DNZ's relationship with Tru Group. In response, Dong Jue Min made numerous misrepresentations about the relationship between DNZ and Tru Group, including that DNZ sold to various trading companies, that those companies – including Tru Group – did not disclose their customers' identities to DNZ, and that he did not know who owned Tru Group. Eventually, in February 2011, GMT learned that DNZ owned Tru Group and had been passing GMT's confidential information to it. GMT also alleges that DNZ established other subsidiary companies, including Seamarky Industrial, Ltd., to further exploit GMT's confidential information and usurp GMT's current and prospective customers.

## B.    Procedural History

GMT filed suit against DNZ, Tru Group, and Dong Jue Min ("Defendants") in the United States District Court for the Middle District of Tennessee in February 2011. GMT alleged that Defendants intentionally interfered with its business relations by using its confidential information to lure away its customers and civilly conspired with one another to do so. It also alleged that DNZ violated the Uniform Trade Secrets Act by misappropriating GMT's confidential information, and violated the United Nations Convention on Contracts for the International Sale of Goods ("CISG") by shipping non-conforming and unordered consumer goods to GMT.

The case was transferred to this Court pursuant to 28 U.S.C. § 1404(a). See [68]. Defendants moved to dismiss GMT's first amended complaint "pursuant to Fed. R. Civ. P. 12(b)(6) and the *Colorado River* doctrine, or in the alternative, to stay CISG claims pending final

adjudication in a parallel proceeding." [94]. The Court struck the motion and ordered Defendants to re-file it as two separate motions: a motion to dismiss under Rule 12(b)(6) and a motion for abstention under the *Colorado River* doctrine. See [100]. Defendants complied with the Court's order, see [101]; [102], and the parties briefed both motions. The Court denied Defendants' motion to stay and abstain and denied Defendants' motion to dismiss without prejudice. See [119]. The Court also directed the parties to submit briefs regarding the appropriate source of substantive law for this case, see *id.*, and concluded that Illinois law would apply. See [128]. Defendants then moved to dismiss Plaintiff's claims. Plaintiff has requested leave to file instanter a surreply. [131]. Defendants oppose this request. [134].

## II.     Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," such that the defendant is given "'fair notice of what the * * * claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir.1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III. Discussion

### A. Violation of the Illinois Trade Secrets Act

GMT alleges that DNZ "acquired GMT's confidential information under circumstances that engendered a duty to maintain the secrecy of GMT's confidential information and limit its use," "misappropriated GMT's confidential information by providing it to Tru Group, which systematically used it, on behalf of DNZ, to drive GMT out of the metallic fiber industry," and did so in a willful and malicious fashion. [38] ¶¶ 115-17. Defendants argue that GMT has failed to allege the existence of a trade secret because it has not alleged that it took measures to guard the secrecy of the information. They also contend that even if the information is considered to be (and was protected as) a trade secret, it was not misappropriated pursuant to the ITSA's definition because the Defendants did not acquire the information "under circumstances giving rise to a duty to maintain its secrecy or limit its use" as required by 765 ILCS 1065/2(b). See [128-1] at 6-9.

To state a cause of action under the ITSA, "a plaintiff must allege facts that the information at issue was: (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business." *Arcor, Inc. v. Haas*, 842 N.E.2d 265, 269 (Ill. App. Ct. 1st Dist. 2005); see also *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003).[1]

---

[1] Other case law from the Illinois Appellate Court sets forth the elements of a misappropriation claim as "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or

Defendants do not dispute that GMT's allegations satisfy the third element; their challenges are aimed at the first two.

Under the ITSA, a "trade secret" is "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). "In other words, plaintiffs must meet two requirements to show their information is a trade secret under the ITSA. First, they must show the information was sufficiently secret to give them a competitive advantage. Second, they must show they took affirmative measures to prevent others from acquiring or using the information." *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 921 (Ill. App. Ct. 1st Dist. 2005) (citations omitted). Both of these requirements are predicated on the secrecy of the information but "emphasize different aspects of secrecy." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003). The second requirement, the one that Defendants have placed at issue here, "prevents a plaintiff who takes no affirmative measures to prevent others from using its proprietary information from obtaining trade secret protection." *Id.* Whether the affirmative measures taken are sufficient to satisfy the reasonableness standard imposed by the ITSA generally is a question of fact. *Id.* at 725; see also *Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007).

_____

use; and (3) the owner of the trade secret was damaged by the misappropriation." *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 1st Dist. 2005). The Court need not resolve at this stage which formulation more accurately reflects Illinois law, as Defendants take issue only with GMT's allegations as to the first and second elements of the action, which are the same under either formulation.

Defendants contend that GMT failed to satisfy the second requirement because its computer system protections were not applicable to DNZ and, moreover, that GMT "freely and without restrictions conveyed the information to DNZ." [128-1] at 7. GMT alleges, however, that its information is not known outside of GMT, that it had in place efforts to prevent even its own employees from accessing and disseminating the information, and that it supplied its information to DNZ for business purposes pursuant to an "explicit understanding that DNZ would not provide that information to third-parties or use it in any manner inconsistent with GMT's business interests." [38] ¶¶ 19-22, 25-26. These allegations relating to GMT's precautionary measures plausibly suggest that GMT made reasonable efforts under the circumstances to keep its information under wraps. "[O]nly in an extreme case can what is a 'reasonable' precaution be determined [as a matter of law], because the answer depends on a balancing of costs and benefits that will vary from case to case." *Learning Curve Toys*, 342 F.3d at 725 (quoting *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991)). This is not such a case.

Nor is it a case in which the Court can determine as a matter of law at this early stage that Defendants could not have misappropriated GMT's trade secrets because Defendants "did not acquire them under circumstances giving rise to a duty to maintain [their] secrecy or limit [their] use." [128-1] at 8 (quoting 765 ILCS 1065/2(b)). The ITSA defines "misappropriation," in relevant part, as the "disclosure or use of a trade secret of a person without express or implied consent by another person who: * * * at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: * * * acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." 765 ILCS 1065/2(b). Defendants contend that the business relationship between DNZ and GMT did not give rise to any sort of fiduciary duty on

DNZ's part to keep the information secret. See [128-1] at 8. Although that ultimately may prove true, see *Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin*, 392 N.E.2d 759, 763-64 (Ill. App. Ct. 2d Dist. 1979), nothing in the language of the ITSA or in the case law to which Defendants point requires that the source of the "duty" countenanced in the ITSA be a fiduciary relationship. To the contrary, the ITSA's language concerning the "circumstances giving rise to a duty to maintain its secrecy" is broad. 765 ILCS 1065/2(b); see also *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 503 (7th Cir. 2011) ("A trade secret misappropriation involves the acquisition of a trade secret through improper means, which requires the breach of a confidential relationship *or other duty* to maintain secrecy." (emphasis added)).

GMT acknowledges that it divulged its trade secrets to DNZ and Dong Jue Min, but claims that it did so because the parties had a "special relationship." [129] at 3 n.1. It is unclear what legal duties, if any, may arise from a "special" relationship. However, GMT also alleges that it disclosed its information to DNZ and Dong Jue Min "with the explicit understanding that DNZ would not provide that information to third-parties or use it in any manner inconsistent with GMT's business interests." [38] ¶ 26. When read in the light most favorable to GMT, this allegation plausibly – albeit minimally – suggests the existence of an oral contract between DNZ and GMT. Defendants assert that Soep failed to "expressly indicate the confidential nature of the information" when he divulged it to DNZ, [128-1] at 8 n.4, but this dispute is one of fact that is more appropriately resolved at the summary judgment stage. For now, the Court must take as true GMT's assertion that the parties' understanding as to the confidentiality of the information was "explicit" rather than one-sided. See *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 515 (7th Cir. 2011) ("Unilateral 'understandings' are not enough to give rise to an enforceable oral contract in Illinois."). And, taken as true, that allegation supplies the requisite source of a

"duty" to keep the information confidential. Defendants' motion to dismiss GMT's ITSA claim is denied without prejudice.

### B.    Intentional Interference with Business Relations

GMT alleges that Defendants intentionally used GMT's confidential information to drive GMT from the metallic fiber industry by devising a pricing scheme that undercut the prices that GMT could offer to its current and prospective customers. Because GMT's allegations plausibly reach both prospective and existing business relationships, the Court considers both species of these closely related "intentional interference" torts. See *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 731 (7th Cir. 1999). The Court notes that "the tort of interference with contractual relations affords a greater degree of protection to the parties to a business relationship because [t]he sacrosanct contractual relation takes precedence over the conflicting rights of any presumptive interferor, including his right to compete and his own prospective advantage." *Miller v. Lockport Realty Grp., Inc.*, 878 N.E.2d 171, 176 (Ill. App. Ct. 1st Dist. 2007) (quotations omitted).

To state a claim for intentional interference with prospective business or economic advantage, a plaintiff must plead: "(1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful or intentional interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003); *Int'l Mktg.*, 192 F.3d at 731; *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 370 (Ill. 1998) (quoting *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991)). To state a claim for intentional interference with an already existing business relationship, a plaintiff

11

must plead: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Int'l Mktg.*, 192 F.3d at 731 (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)).

Defendants argue first that GMT cannot prevail on these claims because "the alleged interference by the Defendants was privileged." [128-1] at 3. In other words, they contend that their alleged interference was not actionable because "[t]he privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1st Dist. 1995). The Illinois Supreme Court has characterized the "competitor's privilege" as an affirmative defense to the tort of intentional interference with prospective business advantage. See *Gen. Motors Corp. v. State Motor Vehicle Review Bd.*, 862 N.E.2d 209, 220 (Ill. 2007). Notably, however, this defense applies only to interference with *prospective* business advantage. See *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.2d 862, 865 (7th Cir. 1999); *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1st Dist. 1995). A defendant may be entitled to the privilege "provided that the defendant has not employed a wrongful means or is not motivated solely by malice or ill will." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 399 (7th Cir. 2003) (citing *Soderlund Bros.*, 663 N.E.2d at 10).

Complaints are not required to anticipate and attempt to plead around affirmative defenses. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012); *Brooks v. Ross*, 578 F.3d 574,

579 (7th Cir. 2009). However, "[a] plaintiff whose allegations show that there is an airtight defense has pleaded himself out of court, and the judge may dismiss the suit on the pleadings under Rule 12(c)," which essentially "comes to the same thing as a dismissal under Rule 12(b)(6)." *Richards*, 696 F.3d at 637; see also *Brooks*, 578 F.3d at 579. Where a plaintiff has pleaded facts that arguably establish an affirmative defense and both sides have briefed the issue, practical considerations—such as discovery costs, attorneys' fees, and judicial efficiency—provide courts with ample reasons to resolve a dispositive point of law early in a case, whether the parties have briefed the question as a 12(b)(6) or a 12(c) issue. In either case, the Court's decision rests on the pleadings and whether a plaintiff has affirmatively pled himself out of court. See *Walczak v. Chi. Bd. Of Educ.*, 739 F.3d 1013, 1016 n.2 (7th Cir. 2014).

The Court cannot conclude that GMT has pleaded itself out of court by alleging facts to establish the applicability of the competitor's privilege. First, to the extent that GMT alleges intentional interference with existing business relations, the privilege is not available. Second, the gravamen of GMT's allegations is Defendants' wrongful acquisition and exploitative use of its confidential information; the competitor's privilege does not lie where a defendant has employed a "wrongful means," and GMT has alleged that Defendants have done just that here. The Court will not dismiss GMT's intentional interference claims on the basis of competitor's privilege. Defendants may reassert their competitor's privilege theory at a later stage of the case if doing so is warranted in light of the facts adduced during discovery.

Defendants also contend, however, that GMT's intentional interference claims are preempted by the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065. The Court agrees. Section 8 of the ITSA provides that the ITSA "is intended to displace conflicting tort, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade

secret." 765 ILCS 1065/8(a); see also *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) ("ITSA abolishes any common law remedies or authority contrary to its own terms."). The ITSA by its terms does not affect "contractual remedies" or "other civil remedies that are not based upon misappropriation of a trade secret." 765 ILCS 1065/8(b)(1), (2). The Seventh Circuit has observed that "Illinois courts have had very little to say about the [preemptive] effect of § 8(a)." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005). Indeed, the Court's own research turned up only a handful of opinions from the Illinois Appellate Court and zero from the Illinois Supreme Court. However, "[b]ecause the Illinois Trade Secrets Act is based on the Uniform Trade Secrets Act of 1985, we can check our intuition about its preemptive force by asking how other states have understood its scope." *Id.* "The dominant view is that claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets." *Id.* at 404-05; accord *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 796 (Ill. App. Ct. 1st Dist. 2002) ("[T]o the extent that these claims involve an alleged misappropriation of Delta's trade secrets, they are preempted by the Act."). In other words, preemption "does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information." *Hecny*, 430 F.3d at 405 (quoting The Uniform Law Commissioners' comment to the Model Act). Courts within this district have interpreted *Hecny* to provide that "the test is whether a plaintiff's claim would stand if the information at issue were not a trade secret.," *SBS Worldwide, Inc. v. Potts*, 2014 WL 499001, at *7 (N.D. Ill. Feb. 7, 2014); see also *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, at *7 (N.D. Ill. Nov. 11, 2013), or, put another way, whether the claim "rests on conduct that is, in essence, the misappropriating of trade secrets." *C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*,

2005 WL 3077998, at *7 (N.D. Ill. Nov. 16, 2005); see also *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 771 (N.D. Ill. 2009).

The test is not satisfied here. GMT alleges that "Primarily through Tru Group, DNZ systematically and routinely *used GMT's confidential consumer information* to locate former GMT customers as potential customers and *discover their specific needs*"; that "DNZ, Tru Group, and Dong Jue Min *intentionally used GMT's confidential information* for the predominant purpose of driving GMT from the metallic fiber industry by causing GMT's customers to terminate their business relationship with GMT in favor of the pricing scheme offered by DNZ through Tru Group, which DNZ calculated *based upon GMT's confidential pricing scheme*"; that "DNZ, Tru Group, and Dong Jue Min *intentionally used GMT's confidential information* for the predominant purpose of offering prospective GMT customers a more favorable pricing scheme, which DNZ calculated *based upon GMT's confidential pricing scheme*;" that "GMT has lost numerous customers to DNZ as a direct result of these practices"; and "GMT has suffered, and continues to suffer, significant financial harm *by virtue of DNZ's misuse of GMT confidential information* and DNZ's improperly influencing GMT's customers to terminate their relationship with GMT." [38] ¶¶ 104-06, 108, 111 (emphases added). Moreover, GMT has alleged that "the confidential information described above qualifies as a 'trade secret.'" *Id.* ¶ 114. It is clear from these allegations that GMT's intentional interference claims are predicated on Defendants' alleged misappropriation and improper use of its confidential information; those actions are the basis for Defendants' alleged interference.

GMT contends that its amended complaint "alleges that Defendants' campaign to steal GMT's customers and destroy GMT's business went far beyond misappropriating GMT's trade secrets." *Id.* at 8. For instance, GMT asserts that "[t]he Complaint explains how Defendants

also crippled GMT (and its customer relationships) by deliberately delaying shipments to GMT and refusing to supply GMT with fiber specifications *Defendants knew GMT needed to fulfill its client's orders*," and contends that "Defendants also knowingly and artificially inflated prices it charged to GMT so that GMT would have to either pass on such higher prices or sell product at a loss." [129] at 3 (emphasis added). However, even these contentions "rest[] on conduct that is, in essence, the misappropriating of trade secrets," *C.H. Robinson*, 2005 WL 3077998, at *7, namely Defendants' misuse and exploitation of their intimate knowledge of GMT's customer specifications and pricing structure. Accordingly, the Court concludes that GMT's intentional interference claims are preempted by the ITSA and grants Defendants' motion to dismiss these claims without prejudice.

### C. Civil Conspiracy

GMT alleges that "Dong Juemin and DNZ conspired with Tru Group, and potentially other unaffiliated companies and other subsidiar[y] companies of DNZ, including but not limited to Seamarky Industrial, Ltd., to interfere with the business relationship between GMT and several of its customers." [38] ¶ 120. Defendants argue that these allegations cannot support a claim for civil conspiracy because the underlying tort claims are preempted by the ITSA. Alternatively, they contend that the conspiracy claim must fail because Defendants are either part of or acting on behalf of the same legal entity and accordingly cannot conspire with one another. See [128-1] at 9-10.

Defendants' first argument carries the day. To state a claim of civil conspiracy under Illinois law, GMT must allege "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an

injury to the plaintiff." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999)). "The function of a conspiracy claim is to extent liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged the wrongdoer's act." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (1994). "A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Id.* "Thus, the gist of a conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement." *Id.* In other words, "conspiracy becomes actionable only when the underlying conduct which is the subject of the conspiracy is independently tortious." *Champion Parts, Inc. v. Oppenheimer & Co.*, 878 F.2d 1003, 1008 (7th Cir. 1989). Here, the tortious acts alleged are predicated on the misappropriation of trade secrets and therefore are preempted by the ITSA. See *supra* Part III.B. Accordingly, there is no independently tortious act on which the conspiracy claim may rest. The Court grants the motion to dismiss GMT's civil conspiracy claim.

## D. Violation of the CISG

GMT's final claim is that DNZ violated the CISG by shipping non-conforming goods and goods of inferior quality. See [38] ¶¶ 123-37. "The CISG is an international treaty, ratified by the United States in 1986, that 'sets out substantive provisions of law to govern the formation of international sales contracts and the rights and obligations of the buyer and seller.'" *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 673 (N.D. Ill. 2005) (quoting *Usinor Industeel v. Leeco Steel Prods., Inc.*, 209 F. Supp. 2d 880, 884 (N.D. Ill. 2002)). It applies "to international sales contracts between parties that are located in signatory countries, and who have not opted out of CISG coverage at the time of contracting." *Id.* Courts in this district previously have

recognized – and the parties do not appear to dispute – that the United States and China are both signatories to the CISG. See *Maxxsonics USA, Inc. v. Fengshun Peiying Electro Acoustic Co., Ltd.*, 2012 WL 962698, at *4 (N.D. Ill. Mar. 21, 2012).

Defendants contend that GMT's CISG claim is barred by res judicata and the Illinois Uniform Foreign-Country Money Judgments Recognition Act ("Money Judgments Act"), 735 ILCS 5/12-661 *et seq*. Defendants contend that GMT filed a breach of contract action against DNZ in the People's Court of Jinwan District, Zhuhai City, Guangdong Province, People's Republic of China, on February 26, 2011. [128-1] at 11. They further assert that "[t]he claims submitted to the People's Court were substantially similar to the CISG allegations submitted by GMT, * * * including claims for the same non-conforming goods and unordered goods." *Id.* Defendants state that the People's Court dismissed GMT's claims in part on March 9, 2012, and that the Chinese appellate court, the Intermediate Court, affirmed the lower court's findings on December 6, 2012. *Id.* Defendants have appended to their brief translated copies of GMT's Chinese complaint, the People's Court ruling dated March 9, 2012, the Intermediate Court's July 23, 2012 order accepting the case for appeal, and the Intermediate Court ruling dated December 6, 2012. See [128-2]-[128-6]. They have requested that the Court take judicial notice of these documents. See [128-1] at 2.

GMT does not address the merits of Defendants' res judicata argument. Instead, it contends that the Chinese litigation was fundamentally unfair and argues that the Court should reject Defendants' translated court documents because (1) "the Court cannot take judicial notice of the fairness of the Chinese proceedings," (2) "GMT has submitted the only properly sponsored evidence in this case regarding the specifics of those proceedings, which establishes that they were repugnant to any notion of fairness and due process," and (3) DNZ's evidence

* * * is not properly sponsored." [129] at 15. GMT "adopts" in its brief "the arguments and evidence in its Stay Response," [111]. [129] at 14. GMT also seeks leave to file instanter a surreply to respond to an "Objections Brief" appended to Defendants' reply brief. See [131]. The proposed surreply is a copy of the surreply that GMT previously sought to file, [114] & [114-1], in response to an "Objections Brief" that is identical to the one appended to Defendants' reply brief [112-5]. The Court denied the previous motion as moot in light of its denial of Defendants' motion to abstain or stay. See [119].

The parties agree that, as a general matter, the Court is permitted to take judicial notice of foreign judgments. See *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 696 (7th Cir. 2009) (citing *Hilton v. Guyot*, 159 U.S. 113, 205-06 (1895)). There likewise is no dispute that the Court may take judicial notice of matters outside the pleadings at the motion to dismiss stage without converting the motion to one for summary judgment. See *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013) (citing *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). The disagreement here is over whether the Chinese litigation – which the Court notes was initiated by GMT – comports sufficiently with due process to merit judicial notice and serve as a basis for res judicata. See *Gabbanelli*, 575 F.3d at 697 ("[T]he significance of the foreign judgment will depend on a variety of other considerations as well, having to do with the reliability of the foreign proceeding for determining the parties' rights."). This dispute ultimately is beside the point, however, because Defendants have failed to affirmatively establish the applicability of res judicata.

Defendants focus much of their argument on the applicability of the Money Judgments Act. See [128-1] at 11-15. Although they are correct that "[a] federal district court sitting in a diversity should apply state law in determining the conclusive effect of a foreign court

judgment," [128-1] at 11 (quoting *Ingersoll Mill. Mach. Co. v. Granger*, 631 F. Supp. 314, 316 (N.D. Ill. 1986), *aff'd*, 833 F.2d 680 (7th Cir. 1987)), they "overlooked [the] concurrent federal question jurisdiction that makes" such an analysis unnecessary. *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 336 (5th Cir. 2003). "The CISG, ratified by the Senate in 1986, creates a private right of action in federal court" – and an independent basis for federal jurisdiction. *Id.*; see also [119] at 13 n.3. Thus, the Court's concern is with the federal principles of res judicata, not the Money Judgments Act. *Cf. Berger v. AXA Network LLC*, 459 F.3d 804, 809-10 (7th Cir. 2006).

Because "[t]his is increasingly one world," the Seventh Circuit has recognized that there is no persuasive reason that "the usual and by no means stringent rules for limiting duplicative litigation should stop at international boundaries." *Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 605 (7th Cir. 1993). Although "[t]here is no consensus" as to which preclusion rules apply in cases involving foreign sovereign states, because "a domestic court is not bound by the full faith and credit clause or statute to comply with the foreign jurisdiction's preclusion rules," "several cases suggest, sensibly [in the view of the Seventh Circuit], that the U.S. court should generally give preclusive effect to the foreign court's finding as a matter of comity." *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011); see also see also *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001); *Victrix S.S. Co., S.A. v. Salen Dry Cargo, A.B.*, 825 F.2d 709, 713 (2d Cir. 1987). "When the foreign judiciary is respected, * * * and the rule on which the finding sought to be given preclusive effect is based doesn't offend a strong U.S. policy, the federal courts should defer to that finding." *Kashamu*, 656 F.3d at 683. "This suggests that the district court should have applied the [foreign jurisdiction's] concept of collateral estoppel in deciding what weight to give to the ruling of the [foreign] magistrate, provided that the concept does not

offend U.S. policy." *Id.*; see also *id.* ("[A]ssume that we should apply the English doctrine of collateral estoppel to this case.").

Here, though much ink has been spilled about the fairness (or not) of the Chinese litigation,[2] neither party has provided the Court with any argument or law regarding China's res judicata or collateral estoppel doctrines. Even if the Court were to assume that the Chinese justice system and these particular proceedings bear the requisite indicia of fairness, or to conclude as much after reviewing the parties' arguments and extensive collection of submitted materials, the Court has been given no guidance as to China's collateral estoppel policies. The Court therefore is in no position to grant Defendants' motion to dismiss GMT's CISG claim on res judicata grounds and accordingly denies the motion without prejudice. The Court also denies GMT's motion to file instanter a surreply [131].

## IV.    Conclusion

For the reasons stated above, Defendants' motion to dismiss [128] is granted in part and denied in part, without prejudice, and Plaintiff's motion for leave to file instanter a surreply [131] is denied. Plaintiff may file an amended complaint within 21 days of this order. This matter is set for status on 4/17/2014 at 9:00 a.m.


Dated:  March 20, 2014                     _____

                                           R_
                                           United States District Judge

---

[2] Although it may not be dispositive, see *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000), the Court notes that the party alleging unfairness, GMT, is the party that initiated the Chinese litigation in the first place.