GLOBAL MATERIAL TECHNOLOGIES, INC.,

      Plaintiff,

    v.

DAZHENG METAL FIBRE CO. LTD.,
DAZHENG METAL FIBRE CO. LTD. d/b/a
ChuanGuPing a/k/a TRU GROUP, and
DONG JUE MIN,

      Defendants.

No. 12 CV 1851

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Global Material Technologies makes and sells metallic-wool products. Beginning in the 1990s, GMT began to obtain a large portion of its metallic fibers from Dahzeng Metal Fibre Co. (DNZ), a Chinese company. The two companies were initially on good terms and maintained a close business relationship. Eventually, however, the relationship disintegrated, and the parties became embroiled in a series of lawsuits in the United States and abroad.

GMT first sued DNZ in China for breach of contract. Two days later, GMT sued DNZ, as well as DNZ's president and one of its supposed affiliates, in the Middle District of Tennessee. In the Tennessee litigation, GMT claimed that the defendants had, among other things, stolen GMT's trade secrets and violated the United Nations Convention on Contracts for the International Sale of Goods. The Tennessee action was ultimately transferred to the Northern District of Illinois, but

in the interim, the Chinese trial court rendered its judgment on GMT's claims (and DNZ's counterclaims) in China. The Chinese court ordered both parties to pay damages, though GMT was ordered to pay more than DNZ. Each party appealed, but the trial court's ruling was largely affirmed by the Chinese intermediate court.

In the present suit, defendants filed counterclaims seeking recognition and enforcement of the Chinese judgment. Defendants also asserted (in answer to GMT's current complaint) that both of GMT's remaining claims are barred by *res judicata*. Defendants filed a motion for judgment on the pleadings, which GMT opposes. For the reasons discussed below, Defendants' motion is granted in part and denied in part.

## I. Legal Standard

A motion for judgment on the pleadings may be granted only if there are no material issues of fact and the moving party is entitled to judgment as a matter of law. *See Nat'l Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987) (citation omitted); *cf. Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993) (citing *Karaganis*, 811 F.2d at 358). All facts must be construed, and all inferences drawn, in the non-movant's favor. *See Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015) (citing *Vesely v. Armslist LLC*, 762 F.3d 661, 664–65 (7th Cir. 2014)). In considering a motion for judgment under Federal Rule of Civil Procedure 12(c), the district court may rely on the pleadings, documents attached to or critical to (and referred to in) the pleadings, or information subject to judicial notice. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012)

(discussing review of motions under Fed. R. Civ. P. 12(b)(6)) (citations omitted); *Lodholtz*, 778 F.3d at 639 (explaining that the same standards govern Rules 12(b)(6) and 12(c)) (citing *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014)).

## II.    Facts

### A.    GMT's Business Relationship with DNZ

GMT is an Illinois-based company that manufactures metallic-wool products. *See* [38] at 1 ¶ 1; *id.* at 2 ¶ 8; [149] at 1 ¶ 1; *id.* at 2 ¶ 8.[1] DNZ, a Chinese company based in Zhuhai, China, supplied GMT with steel fibers from 1996 to 2010. *See* [160] at 1 ¶ 179; *id.* at 2 ¶ 183. For a time, the two companies maintained a close business relationship: GMT's president attended meetings by DNZ's board of directors, and GMT maintained a 25% ownership interest in DNZ. *See* [38] at 3 ¶¶ 12, 17; [149] at 3 ¶¶ 12, 17. Annual transactions between the two companies at one time exceeded one million dollars. *See* [38] at 6 ¶ 32; [160] at 5 ¶ 32. But the relationship eventually soured, and the two parties (who no longer do business together, *see* [38] at 6 ¶ 33; [149] at 5 ¶ 33) became entangled in multiple lawsuits.

---

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets; referenced page numbers are from the CM/ECF header placed at the top of filings. The facts related in this opinion are taken from the parties' pleadings in this case (and answers thereto), as well as from translations of court documents pertaining to the parties' civil suit in China.

In certain instances, the parties assert that they lack sufficient information to form a belief about the truth of an allegation made by the other party. *See, e.g.*, [149] at 2 ¶ 8 (stating that defendants "lack knowledge or information sufficient to form a belief as to the truth of [plaintiff's] allegations" concerning GMT's purported manufacture of metallic-wool products). Although such responses generally have the legal effect of a denial, *see* Fed. R. Civ. P. 8(b)(5), I assume, for the limited purpose of relating background information immaterial to the resolution of the current motion, that these allegations are true.

**B.    GMT's Suit in China**

On February 26, 2011, GMT sued DNZ in the Zhuhai People's Court of Guangdong Province, China. *See* [160] at 4 ¶ 190; *see also* GMT's "Civil Complaint" (as translated), [172-2] at 8–15. In its Chinese complaint, GMT brought against DNZ a series of contract-based claims, alleging that DNZ had violated the parties' agreement by shipping to GMT (or its customers) products suffering from severe quality issues, products that otherwise did not conform to GMT's specific purchase orders, and products that GMT simply had not ordered at all.

*1.    The Parties' Claims in China*

According to GMT, in June 2008 DNZ began to send steel-wool shipments that contained rusted fibers. *See* [172-2] at 10. The problematic shipments stemmed from the same invoice (No. RJCT0), *see id.* at 9, and triggered a series of back-and-forth communications between the two companies, *see id.* at 10—resulting, said GMT, in DNZ's agreement to: (1) pay the cost of sorting the rusty fibers from the usable ones; (2) accept the return of the rusted product; and (3) reimburse GMT for the shipment of said product back to DNZ (and all other related costs or expenses), *see id.* GMT did inspect all 752,000 pounds or so of the RJCT0 shipments, identified and separated out 268,568 pounds supposedly damaged by rust, and returned the latter (at GMT's own expense) to DNZ in China. *See id.* But DNZ never refunded GMT for the returned product, and never reimbursed GMT for any of its sorting- or shipping-related costs. *See id.*

Meanwhile, claimed GMT, DNZ had begun to disregard GMT's purchase orders completely, shipping to GMT large quantities of products that did not meet GMT's specifications (and about which customers had started to complain). *See id.* at 13. An inspection by GMT revealed that, of the 13,170 pounds sent to GMT under invoice No. 1192011—whose shipments spanned from April to October 2008—only 1,975 of them (approximately 15%) actually met GMT's requirements. *See id.* Similar issues resurfaced in July 2010, when GMT discovered more non-conforming goods in shipments related to a different invoice (No. 1172011). *See id.* at 11. One month later, one of GMT's customers found rust in yet another of DNZ's shipments (invoice No. 1172011-2). *See id.* According to GMT, DNZ admitted the presence of rust in the latter shipment, and admitted the non-conformity of certain goods (as to invoice No. 1172011), but refused to reimburse GMT for any of the products or to accept their return. *See id.* at 11–13.

GMT sued DNZ in China, requesting compensatory damages for DNZ's alleged breaches of contract, as well as an injunction requiring DNZ to accept the return of the faulty or non-conforming goods still in GMT's possession. *See id.* at 8. DNZ, for its part, denied any wrongdoing and alleged that GMT had fabricated the "quality" issues as a scheme to avoid paying DNZ for its shipments. *See* Civil Judgment of The People's Court of Jinwan District, Zhuhai City, Guangdong Province, The People's Republic of China (as translated), [172-3] at 29. According to DNZ, it was GMT—not DNZ—who had breached the parties' contract: first by amassing over nine hundred thousand dollars' worth of unpaid balances, and next

by failing for several years to purchase quantities at or above the agreed annual minimum. *See id.* at 30. DNZ filed corresponding counterclaims, requesting that GMT be ordered to pay: (1) its outstanding balance of $996,503.77; (2) 15% of the value of all purchase-quantity deficiencies (as allegedly required by the contract); and (3) various related damages. *See id.* at 30–31.

### 2. *The Trial Court's Judgment*

On September 8, 2011, the Chinese court of first instance (for simplicity, the "trial court") held a public hearing before a three-judge panel. *See* [160] at 5 ¶ 196; [172-3] at 26, 38. Both parties were represented by counsel. *See* [172-3] at 26. The court considered the parties' arguments and evidence, and issued its ruling on March 9, 2012. *See generally* [172-3] (as translated).

After determining that Chinese law applied to the parties' breach-of-contract claims, *see id.* at 33, the trial court granted in part and denied in part GMT's request for damages for the allegedly-rusty product shipments in invoice No. RJCT0. The court first concluded that GMT had not met its burden of proof as far as demonstrating that the products were in fact rusted, since: (1) the e-mail messages in which DNZ had allegedly admitted to the existence of the rust did not actually show any such admission; (2) a customs inspection by Chinese officials (performed when GMT returned, by DNZ's agreement, the supposedly faulty goods) failed to show that there was any rust; and (3) GMT submitted no independent proof of rust, such as testing or inspection results from a third party. *See id.* at 34. But GMT was not entirely out of luck, as DNZ had agreed to accept the return of

the RJCT0 products—indeed, DNZ had taken back the supposedly-rusty goods, and had managed to resell them to another buyer. *See id.* The court determined that DNZ therefore should refund GMT for that batch of product (valued at $154,494), and should reimburse GMT for the cost of shipping those goods back to DNZ (an additional $52,475). But because there was no actual proof of rust, the court ruled that DNZ was not liable for any other costs incurred by GMT in inspecting, sorting, or repackaging those shipments. *See id.*

As to GMT's claims concerning shipments under other invoices (Nos. 1192011, 1172011, and 1172011-2, as discussed above), the trial court again rejected GMT's argument that there had been any quality issues with those shipments. Once again, GMT's evidence failed to show any admission by DNZ that such issues in fact existed, and without any third-party test results demonstrating that there was indeed a problem, GMT had not met its burden of proof. *See id.* The court was similarly unpersuaded by GMT's contention that DNZ was liable for shipping goods that did not conform exactly to GMT's purchase orders. DNZ was off the hook for that one, said the court, because GMT had in the past accepted extra-order goods from DNZ. *See id.* at 35. Moreover, the parties had agreed to a maximum quantity of goods to be delivered by DNZ each year, and DNZ's total shipments to GMT were far below this upper limit. *See id.*

Turning to DNZ's counterclaims (which sought payment of GMT's allegedly outstanding balance of $996,503, as well as 15% of the value of GMT's supposed purchase-quantity shortfalls), the trial court again found in DNZ's favor. The court

first determined that DNZ had proven that it had, as claimed, shipped goods to GMT totaling $12,097,677.34 in value. *See id.* Since the contract called for delivery of purchased goods on an "FOB" basis,[2] DNZ, as the seller, was responsible for addressing export-related requirements. *See id.* In order to clear the goods for export, DNZ would have had to file with the Chinese customs office a myriad of documents, including contracts, invoices, or other papers identifying the type, quantity, and price (unit and total) of the goods to be shipped. *See id.* The customs office would verify this information—which, if the goods were cleared for export, would also appear on the customs-declaration form issued by that office. *See id.* Several copies of the form are typically made, of which one may be used to file a claim for an export-tax rebate. *See id.*

In the case before the Chinese trial court, DNZ submitted as proof of its shipments to GMT (and of the value thereof) copies of GMT's official customs-declaration forms as issued by the Chinese customs bureau, as well as invoices used by DNZ to claim export-tax rebates. *See id.* The tax invoices included not only the quantity and price of the exported goods (which matched the figures shown on the customs declarations), but the relevant contract number and name of the

---

[2] "FOB" (or "F.O.B.") stands for "free on board," which refers to a mechanism of contracting that allocates delivery-related rights and duties between the buyer and seller of goods. *See* Black's Law Dictionary 781 (10th ed. 2014). Typically, free-on-board provisions require that the seller take responsibility (and bear corresponding risks) for delivering the goods only to the transporter, who is selected and arranged for by the buyer. The seller's delivery obligations end when the goods are delivered into the transporter's possession, at which point the buyer takes over any risk of loss, as well as any shipping or transportation costs. *See id.* If the goods must be exported, clearance for export is the seller's responsibility. *See id.* The Chinese trial court's explanation of the doctrine confirms that "F.O.B." in China means the same as it does in the United States. *See* [172-3] at 35.

"consignee" (*i.e.*, buyer): GMT. Thus, said the court, the tax invoices proved that GMT was the recipient of the exported goods declared in the customs forms, and the one set of forms corroborated the other in proving that DNZ had indeed shipped to GMT goods in the amount (and value) DNZ had claimed. *See id.*[3] Since those documents indicated that DNZ had supplied to GMT goods totaling $12,097,677.34 in value, GMT was liable for that amount—that is, to the extent it could not prove that it had already paid for what it had received. But the court found that GMT did not know, and could not prove, how much it had already paid. *See id.* at 35–36.

As evidence that GMT had paid most of the twelve-million-dollar balance, GMT pointed to foreign-exchange collection forms ("Form for Collection, Verification and Settlement of Export Proceeds in Foreign Exchange") submitted by DNZ. *See id.* at 36. Some of those forms proved payment, said GMT, because the word "settled" appeared on those documents. *See id.* But the trial court was unpersuaded by this evidence because, according to DNZ, the "settlement" notations reflected not GMT's proper payment, but a strategy by DNZ to avoid paying additional taxes in light of GMT's delinquency. *See id.* If foreign-exchange payments were not collected within a certain period of time, exported goods would be taxed as though they had been sold domestically (*i.e.*, at a higher rate). *See id.* To avoid the additional tax burden, DNZ claimed that it applied *other* payments to the otherwise-unsettled transactions with GMT, such that the overdue payments in question were still, in

---

[3] There were also foreign-exchange settlement receipts, which showed that GMT had paid for, and DNZ had collected payment for, at least some of the goods. *See* [172-3] at 35.

fact, outstanding. *See id.* In light of DNZ's explanation, and without any evidence from GMT that it had already paid for the twelve million dollars' worth of goods it had received, the court found that GMT was liable to DNZ for any outstanding balance. As DNZ admitted that GMT had already paid $11,101,173.57 toward the relevant shipments, the court held that GMT was liable only for the remainder ($966,503.77). *See id.* at 35–36.

But with GMT's delay in payment came additional losses for DNZ. Lost interest on the payments, for one, as well as losses related to fluctuations in the exchange rate between U.S. and Chinese currencies. *See id.* at 36. Additional taxes were imposed on some of the sales, too (since, as discussed above, delays in collecting foreign payments can and did result in exported goods being taxed at the higher domestic rate). Because these losses were caused by GMT's delay, the court found GMT liable for these additional damages, as well. *See id.* at 36–37.

As for DNZ's second counterclaim—that GMT should be liable for 15% of the value of any purchase-quantity shortfalls—the court found for GMT. The trial court determined that over the course of the parties' business relationship, GMT had often failed to order the minimum annual quantities as set forth in the contract, but DNZ had nonetheless continued to supply goods under that agreement, without objection. *See id.* at 37. Thus, the court concluded, it could be inferred from the parties' behavior that they had tacitly agreed to modify the terms of the contract. GMT, as a result, was not liable for "insufficient" purchasing. *See id.*

### 3. The Appeal in China

The judgment of the Chinese trial court was entered on March 9, 2012. *See* [160] at 5 ¶ 194. Each party filed an appeal with the Intermediate People's Court of Zhuhai City. *See id.* at 9 ¶ 207; *see also* "Notification of Case Acceptance," Intermediate People's Court of Zhuhai City (as translated), [172-4] at 3. Among other things, GMT was unhappy with the ruling that it must pay $966,503.77 in outstanding balances (and related damages), and asked the intermediate court to vacate certain portions of the lower court's order. *See* Civil Judgment of The Intermediate People's Court of Zhuhai City, Guangdong Province (as translated), [172-5] at 41. DNZ was dissatisfied with the part of the order denying damages for GMT's alleged purchase-order shortfalls, and asked on appeal that that decision be set aside. *See id.* at 47.

The court of appeals agreed in large part with the trial court, affirming the majority of the latter's conclusions. *See generally* [172-5]. The intermediate court did make one adjustment, however. In the proceeding below, the trial court had held GMT liable for damages related to the approximate $966,500 in payments delinquent under the contract. These related damages included lost interest and damages from variations in the currency-exchange rate. On appeal, GMT argued that even if it were liable for such damages (though it claimed it was not), the trial court had calculated them incorrectly. *See id.* at 43. Whereas the parties' contract called for GMT's payment within 90 days of any bill of lading, the lower court had relied on DNZ's list of overdue payments, and some of those payment periods were

listed as being fewer than 90 days. *See id.* (In defense of its original submissions—and of the trial court's calculations as based on those submissions—DNZ argued that the "pay by" requirement had been orally altered by the parties, first to 60 days, then to 45. *See id.* at 51.)

The court of appeals concluded that GMT was liable for the related damages, but agreed that they had been calculated incorrectly. The parties' written agreement had provided that all payments should be made within 90 days; and although DNZ argued that the written contract had been modified by oral agreement, the intermediate court rejected this argument because DNZ had offered no proof in support. *See id.* at 52. The lower court's reliance on DNZ's representations of shorter payment periods was therefore improper, and an adjustment down required. *See id.*

### C.    GMT's Lawsuit in the United States

On February 28, 2011 (two days after GMT filed its claim in China), GMT sued DNZ in the United States District Court for the Middle District of Tennessee. *See* [1]. Also named as defendants in the United States action were Tru Group, an alleged subsidiary of DNZ, and Dong Jue Min, DNZ's president. *See id.* at 3 ¶ 16; *id.* at 4 ¶ 30. On defendants' motion, the action was transferred from Tennessee to the Northern District of Illinois. *See* [67] (ordering transfer under 28 U.S.C. § 1404(a)).

In its U.S. complaint (amended before transfer, *see* [38]), GMT again included allegations that DNZ had shipped to GMT rusted products, products suffering from other (unspecified) quality problems, and products that failed to conform to GMT's

purchase orders and requirements. *See id.* at 12–15. But GMT also alleged other actions by DNZ concerning the use of GMT's confidential information. The two companies, GMT alleged, originally had a close working relationship, *see id.* at 3 ¶ 15; and when times were good, GMT shared with DNZ (through DNZ's directors and shareholders, including Dong Jue Min) a great deal about the former's business approach—among other things, its pricing strategies, customer list, customer-specific product specifications, and internal operating procedures. *See id.* at 3–4 ¶¶ 18–19. GMT admitted that it had supplied this information voluntarily, but with the explicit understanding that DNZ would neither communicate the information to third parties nor use it to GMT's detriment. *See id.* at 6 ¶ 26. But, according to GMT, that is precisely what DNZ did. GMT claimed that through its subsidiary, Tru Group (and possibly other such companies), DNZ contacted GMT's current and prospective customers, and offered them a pricing scheme derived from GMT's own confidential pricing structure. *See id.* at 4 ¶ 19; *id.* at 8–9 ¶ 45.

GMT brought as part of its domestic action four claims against defendants DNZ, Tru Group, and Dong Jue Min: (1) intentional interference with business relations; (2) violation of the Uniform Trade Secrets Act;[4] (3) civil conspiracy; and (4) violation of the United Nations Convention on Contracts for the International Sale of Goods (CISG). *See id.* at 16–19. The interference and conspiracy claims were

---

[4] Both Tennessee and Illinois have enacted versions of the Uniform Act. *See* Tenn. Code Ann. § 47-25-1701 *et seq.*; 765 Ill. Comp. Stat. 1065/1 *et seq.*

dismissed in a ruling by Judge Dow. *See* [136] at 16–17. The trade-secrets and CISG claims remain pending.

Defendants filed two counterclaims, seeking recognition of the Chinese judgment (as entered by the intermediate court in Zhuhai) under the Illinois Uniform Foreign-Country Money Judgments Recognition Act, and enforcement of that judgment in the United States. *See* [149] at 24–27. In their answer to GMT's complaint, defendants also asserted that both of GMT's remaining claims are precluded by *res judicata*. *See id.* at 20 ¶¶ 170–174. Defendants move for judgment on the pleadings as to their counterclaims, as well as to their affirmative defense of claim preclusion. *See generally* [163], [163-1].

## III.   Analysis

### A.   Judicial Notice of the Chinese Judgment

District courts may take judicial notice of a foreign judgment. *See Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 696 (7th Cir. 2009) (citing *Hilton v. Guyot*, 159 U.S. 113, 205–06 (1895); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 411–12 (6th Cir. 2006); *United States v. Garland*, 991 F.2d 328, 332–34 (6th Cir. 1993)). The significance of a foreign judgment, however, depends on its meaning; thus, an accurate translation is also required. *See id.*; *see also* Fed. R. Civ. P. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). Attached to defendants' counterclaims here were original-language copies of several documents related to

the proceedings in China—the complaint, the judgments of the Chinese trial and appellate courts, and the intermediate court's acceptance of appeal—and English translations of the same. *See* [149] at 22–23 ¶¶ 190, 195; *id.* at 24 ¶¶ 199, 201; *see also* [149-2] (complaint); [149-3] (trial-court judgment); [149-4] (acceptance of appeal); [149-5] (intermediate-court judgment). Although GMT initially contested the authenticity of the translations, defendants later filed re-translations to which GMT does not object. *See* Transcript of March 12, 2015 Proceedings, [200] at 4. I therefore take judicial notice of the Chinese proceedings and judgment, as related in the revised translations. *See* [172-2] at 8–14; [172-3] at 26–38; [172-4] at 3; [172-5] at 35–54.

## B.    Recognition and Enforcement of the Chinese Judgment

Defendants seek recognition and enforcement of the Chinese intermediate court's judgment under the Illinois Uniform Foreign-Country Money Judgments Recognition Act. *See* [163-1] at 7; [181] at 12. The Recognition Act permits, as its title implies, recognition of a judgment rendered by a "foreign country,"[5] where the judgment: (1) grants or denies recovery of a sum of money; and (2) is final, conclusive, and enforceable under the law of that foreign country. *See* 735 ILCS 5/12-663(a). It is the burden of the party seeking recognition—here, defendants—to establish that the Act applies. *See id.* at 5/12-663(c). If entitled to recognition, the

---

[5] The Act defines "foreign country" as a government other than: the United States; a state, district, commonwealth, territory, or insular possession of the United States; or any government whose decisions are otherwise entitled to full faith and credit under the United States Constitution. *See* 735 ILCS 5/12-662. China is a foreign country as defined by the Act.

foreign-country judgment is conclusive between the parties to the same extent as would be a judgment rendered by another state entitled to full faith and credit, and it is enforceable to the same extent as would be a judgment rendered in Illinois. *See id.* at 5/12-667. A request for recognition may be raised as a counterclaim in a pending suit, as defendants have done here. *See id.* at 5/12-666(b).

In the Chinese action, the trial court both granted and denied recovery by the litigants of various sums of money. DNZ was ordered to reimburse GMT for certain expenditures (related to the RJCT0 shipments), while GMT was ordered to pay some $966,000 in outstanding balances, as well as related damages. So the first requirement for recognition is satisfied. The second requirement for recognition— that the foreign judgment be final and enforceable under the laws of the foreign country—is also met. GMT agrees that the judgment of the Chinese intermediate court is final and enforceable in China, as it cannot be appealed there. *See* [160] at 9 ¶ 208. Thus, the Chinese judgment is presumptively entitled to recognition under the Act.

The Recognition Act provides that a foreign judgment meeting the above two criteria "shall" be recognized unless: (1) the foreign court did not have jurisdiction (personal or subject-matter), *see* 735 ILCS 5/12-664(b)(2)–(3); or (2) the foreign judicial system under which the judgment was rendered does not generally provide impartial tribunals or "procedures compatible with the requirements of due process," *id.* at 5/12-664(b)(1). As used in the Act, "compatible with due process" means "fundamentally fair" or adhering to principles of basic fairness. *See Society of*

*Lloyd's v. Ashenden*, 233 F.3d 473, 477 (7th Cir. 2000) (citations omitted); *see also id.* (distinguishing the "international concept of due process" from its American counterpart). If either element is present, the domestic court cannot recognize the foreign judgment. *See* 735 ILCS 5/12-664(b). If, however, neither of these elements is present, the domestic court must recognize the foreign judgment unless it is shown that the specific proceeding at issue was otherwise problematic for one or more reasons as set forth in the Act—for example, the proceeding was incompatible with due process (*i.e.*, it was fundamentally unfair), *see id.* at 5/12-664(c)(8); *Ashenden*, 233 F.3d at 477; the judgment, or cause of action on which it was based, was repugnant to United States public policy or the public policy of Illinois, *see* 735 ILCS 5/12-664(c)(3); or the judgment was rendered "in circumstances that raise substantial doubt about the integrity of the rendering court" as to that judgment, *id.* at 5/12-664(c)(7). If any such reason is shown, the court may in its discretion decline to recognize the judgment; but non-recognition is not compelled. *See id.* at 5/12-664(c) (stating that the court "need not" recognize the foreign-country judgment). It is the burden of the party opposing recognition—here, GMT—to show that a ground for non-recognition exists. *See id.* at 5/12-664(d).

GMT has not raised any issues that would compel non-recognition of the Chinese judgment in this case. GMT admits in its answer to DNZ's counterclaim that the Chinese court had both personal and subject-matter jurisdiction. *See* [160] at 10 ¶ 209. And GMT does not allege that the Chinese judicial system as a whole is biased and incompatible with principles of basic fairness. Non-recognition,

therefore, is not mandatory. *See* 735 ILCS 5/12-664(b). The court may nonetheless decline to recognize the foreign judgment (under Section 664(c)) if GMT can show that the particular proceeding at issue was problematic. This is the argument on which GMT hangs its hat: the Chinese judgment should not be recognized, says GMT, because the foreign proceedings in this instance were not fair or impartial, and the rendering court's integrity in this case was suspect. *See* [160] at 5–7 ¶¶ 194, 196, 200; *id.* at 9–11 ¶¶ 208–12; *id.* at 13–14 ¶¶ 217–19. GMT contends that the fairness (or not) of the Chinese proceedings is a question of fact that cannot be resolved on the pleadings, so judgment cannot be awarded to DNZ at this stage of the litigation. *See* [167] at 11; [175] at 2–3, 7–10. The determination of whether a particular proceeding was fair does involve certain considerations that are best treated as factual matters. *Gabbanelli*, 575 F.3d at 697 (citations omitted). I do not address any such factual issues here.

At bottom, what GMT seeks is an examination by a United States court of how exactly the Chinese court approached GMT's lawsuit abroad—and whether, with respect to certain aspects of that approach, the proceedings were fair enough to GMT. This kind of "retail" inspection is generally disfavored, as it frustrates the very purpose of the Recognition Act: to provide "a streamlined, expeditious method for collecting money judgments rendered by courts in other jurisdictions." *Ashenden*, 233 F.3d at 477; *see also id.* ("The process of collecting a judgment is not meant to require a second lawsuit . . . ." (citing *Bank of Aspen v. Fox Cartage, Inc.*, 126 Ill.2d 307, 533 N.E.2d 1080, 1083 (1989); *Resolution Trust Corp. v. Ruggiero*, 994 F.2d

1221, 1226 (7th Cir. 1993))). A retail approach is especially inappropriate where, as here, the party now opposing recognition is the same party who filed suit abroad—and the same party who, had they won in the foreign proceeding, would have tried to enforce that judgment in the United States, *see* Transcript of March 12, 2015 Proceedings, [200] at 9. Recall, too, that GMT did not come away from the proceedings in China empty-handed. GMT won in the Chinese trial court a judgment for more than $200,000. And, besides affirming that judgment, the court of appeals modified DNZ's judgment against GMT—in GMT's favor. This is not a situation in which the prior proceeding was so obviously biased or unfair that a dissection of the kind sought by GMT is warranted. The Recognition Act is based on the principle of international comity, which reflects a general respect for the decisions of foreign judiciaries, *see, e.g.*, *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011). It was not meant as a tool for gaining second chances at a (more) favorable judgment. Thus, the focus in this instance ought not to rest on the details of the individual proceeding in China, and nor does the statute require such parsing. The focus, rather, should be on the procedures afforded by the Chinese judicial system as a whole.

But as noted above, GMT has not alleged that the Chinese judicial system in general provides biased courts or unfair procedures. Indeed, that GMT would have tried to enforce a more favorable Chinese judgment, had it obtained one, merely confirms that GMT has no creditable objection to how judicial proceedings are usually conducted in China. Even if GMT had pleaded systemic defects, whether a

particular judicial system is fundamentally biased or unfair is not a question of fact; it is a question "about the law of a foreign nation"—and so, in answering this question, the district court may consult "any relevant material or source." *Ashenden*, 233 F.3d at 477 (citing Fed. R. Civ. P. 44.1; *Pittway Corp. v. United States*, 88 F.3d 501, 504 (7th Cir. 1996); 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2446 (1995)). Although given an opportunity to do so, *see* Transcript of September 18, 2014 Proceedings, [178] at 7—and although it is GMT's burden to identify any grounds for non-recognition, *see* 735 ILCS 5/12-664(d)—GMT has not provided any materials suggesting that the Chinese judicial system is problematic in such a way as to preclude recognition of (that is, to mandate *non*-recognition of) the foreign judgment in this case.

Accordingly, the judgment of the Chinese intermediate court is enforceable under the Recognition Act. Defendants' motion for recognition and enforcement of the judgment of the Chinese intermediate court is therefore granted.

### C. Claim Preclusion

If entitled to recognition under the Act, a foreign judgment is conclusive between the parties to the same extent as would be a judgment rendered by a state entitled to full faith and credit. *See* 735 ILCS 5/12-667(1). Under Article IV of the United States Constitution, Illinois must give to the judgment of a sister state the same preclusive or *res judicata* effect that the issuing court would give it. *See Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 193 Ill.2d 560, 565 (2000) (citing *Durfee v. Duke*, 375 U.S. 106, 109 (1963); *Hays v. La. Dock Co.*, 117 Ill.App.3d 512,

517 (1983); *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guaranty Ass'n*, 455 U.S. 691 (1982)). So the question here is, what preclusive effect would Chinese law give to the judgment of the Chinese intermediate court? *Cf. Kashamu*, 656 F.3d at 683 (noting that, under principles of international comity, United States courts should apply the foreign court's concept of collateral estoppel in deciding what weight to give that court's ruling).[6]

Defendants contend that Chinese principles of *res judicata* bar GMT from proceeding with either of its remaining claims. *See* [163-1] at 8–9. To support their argument, defendants rely on the declaration of Jacques deLisle, a law professor and director of the Center for East Asian Studies at the University of Pennsylvania, *see id.*; Declaration of Jacques deLisle, [163-2] at 2 ¶ 1. Since the question of whether Chinese *res judicata* operates to preclude GMT's claims is a question of foreign law, Rule 44.1 of the Federal Rules of Civil Procedure permits consideration of Mr. deLisle's statements. *See Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 628 (7th Cir. 2010) (citing Fed. R. Civ. P. 44.1). However, as expert declarations may sometimes "add[] an adversary's spin," *see id.* at 629, I also consider whether, and to what extent, the materials on which deLisle relies in fact support his assertions.

---

[6] Defendants also contend that federal and Illinois claim-preclusion standards bar GMT's claims in this case. *See* [163-1] at 9–15 (discussing the elements of federal claim preclusion); [181] at 20 (discussing claim-preclusion doctrine in Illinois). Neither is relevant here. As explained above, the operative question is whether and to what extent the law in China would give preclusive effect to the judgment rendered there. That Chinese principles of *res judicata* may share certain similarities with those employed domestically, as defendants urge, does not convert the governing standard to an American one. It is Chinese claim-preclusion law that matters here.

According to Mr. deLisle, the Civil Procedure Law in China provides that Chinese courts will not accept a new lawsuit if the suit is filed when a judgment has already become legally effective in the same case. *See* [163-2] at 5–6 ¶ 12 (citing Civil Procedure Law art. 111(5) (2007), as amended art. 124(5) (2012)). A new suit is "the same case" as a prior case, says deLisle, if it arises from the same facts or underlying dispute. *See id.* at 6 ¶ 14. The case law supports this contention—at least with respect to disputes arising from the same set of facts. In *EOS Engineering Corp. v. Xinjiang Electricity Production Co.*, 2004 SUP. PEOPLE'S CT. GAZ. 10 (Sup. People's Ct. 2003), for example, the Supreme People's Court of China (China's highest court, *see* [163-2] at 6) precluded a party from filing a second tort action against the same defendant because both suits were based on the same facts, *see* [172-12] at 3.[7] It made no difference that the causes of action differed slightly; the suits were based on the same facts, and were against the same defendants—and so, under Article 111(5), the plaintiff's only recourse was to appeal the existing judgment or petition for a retrial. *See id.*; *see also Fenghua Buyun Co. v. Shanghai Worldbest Co.*, 2006 SUP. PEOPLE'S CT. GAZ. 6 (Sup. People's Ct. 2005), [172-13] at 4 (enforcing the same rule against re-litigating the same matter, where "the same matter" means that the "essence of [the two] claims" is the same).[8]

---

[7] The publicly-available version of this opinion includes an English translation. *See generally* [172-12].

[8] The publicly-available version of this opinion includes an English translation. *See generally* [172-13].

The CISG claim stems from the same set of facts as GMT's breach-of-contract claim in China. In the Chinese action, GMT alleged that DNZ was liable for shipping to GMT (or its customers) rusted goods and goods sent in disregard of—or otherwise not in conformance with—GMT's purchase orders. This is precisely what GMT alleges here in support of its CISG claim. *See* [38] at 12–14, 18–19. True, the causes of action are not identical. GMT's action in China claimed breach of contract, its suit here a contravention of an international treaty on the sale of goods. But the underlying facts overlap almost entirely, and the essence of the two claims is decidedly the same.

The parties, however, are somewhat different. In China, GMT sued only DNZ, while here, GMT sues not only DNZ, but also its president (Dong Jue Min) and subsidiary (Tru Group). Is the CISG claim still barred? In *Eos Engineering*, for example, the Chinese Supreme Court stated that retrial was precluded on the "same facts *and defendants*." [172-12] at 3 (emphasis added). But other authority suggests that the parties need not be identical for *res judicata* to prevent the second suit. In *Beijing Golden Holiday Travel Agency Co., Ltd. v. Ctrip Computer Technology (Shanghai) Co., Ltd. et al* (Sup. People's Ct. 2007), the Supreme Court of China confronted a case in which the plaintiff had sued the same defendant twice, for essentially the same behavior (false advertising). *See* [172-15] at 15 (as translated).[9] But in addition to the original defendant, "Ctrip" or "Ctrip Computer,"

---

[9] The publicly-available version of this opinion does not include an English translation. *See* [172-15] at 2–8. Defendants have provided a translation prepared by an independent interpretation service, *see* 172 at 2 n. 4; [172-15] at 9–17, to which GMT does not object.

the second suit had also named as defendants several other businesses, *see id.*; *see also id.* at 9–10 ("Ctrip Commerce," "Beijing Ctrip," and Hebei Comfort International Airline Services Co., Ltd.). Despite the added parties, the court confirmed that the second suit could not proceed because the original defendant— Ctrip—was still a party, and Ctrip was the one supposedly responsible for the alleged misconduct. *See id.* at 15.

The situation here is not dissimilar. GMT sued only DNZ in China, and now adds in its United States litigation additional defendants. But the allegations underlying the CISG claim—which, as discussed above, is essentially the same as the breach-of-contract claim filed abroad—concern only DNZ's conduct. *See* [38] at 12–14 (discussing only DNZ, not Tru Group or Dong Jue Min, in connection with the purported shipment of rusted, non-conforming, and unordered goods). DNZ appears as a defendant in both actions, and DNZ is the party allegedly responsible for the misconduct at issue in both claims. GMT is therefore barred under the Chinese concept of claim preclusion from proceeding with its CISG claim.

Defendants assert that GMT is likewise barred from bringing its trade-secrets claim in the current suit, because GMT cannot "split" this claim from its contract claim and file suit on each one independently. Both claims arise from facts surrounding the parties' business relationship, say defendants, so if GMT wanted to sue defendants for misappropriation of trade secrets, GMT was obligated to bring that claim with its contract claim in China. *See* [163-1] at 11–13. But defendants' argument rests solely on domestic principles of claim preclusion. *See id.* Defendants

have not established, as is their burden, that Chinese law would prevent GMT from bringing its trade-secrets claim at a later time.

According to Mr. deLisle, Chinese law recognizes a cause of action for misappropriation of trade secrets that is similar to the cause of action available in the United States. *See* [163-2] at 11–12 ¶ 24. And, says deLisle, Chinese law also rejects efforts at claim-splitting—that is, plaintiffs are generally precluded from litigating not only those claims that have already been raised and adjudicated in an earlier action, but also any claims that *could* have been raised in the earlier suit. *See id.* at 9 ¶ 20 (citing Interpretation of the Supreme People's Court on Problems regarding the Ascertainment of Compensation Liability for Emotional Damages in Civil Torts (Sup. People's Ct. 2001), art. 6, [172-10]). But the authority on which Mr. deLisle relies does not adequately support the proposition that Chinese law in general forbids claim-splitting, or, if it does, what the boundaries of the rule actually are. The cited material, a judicial proclamation by the Supreme Court of China, states only that "[t]he people's court shall not accept cases . . . claiming emotional damages based on facts relating to a previous lawsuit" where the party did not claim such damages in the earlier suit. [172-10] at 3.[10] Thus, it seems that in China (much as in the United States), claims for damages arising from emotional distress must be brought simultaneously with claims seeking compensation for any underlying injuries. *See id.* at 2 (stating that the court will accept claims for

---

[10] The publicly-available version of this document includes an English translation. *See generally* [172-10].

emotional damages stemming from "infringement" of one's "right of health [or] right of body"). But GMT is not seeking here any emotional damages arising from an earlier-suffered, already-adjudicated injury; and there is no reason to presume that the above principle extends to all types of legal claims and lawsuits. GMT seeks damages for the theft of its proprietary information, and defendants have presented no materials from which it may be reasonably concluded that, under Chinese law, GMT was compelled to file this claim along with its breach-of-contract claim.

Even if it were true that Chinese law requires litigants to bring all related claims simultaneously, the extent to which such claims must be related remains unclear. If, for example, the test in China is simply whether the plaintiff *could have alleged* in the first suit a second cause of action—because, for example, the plaintiff already had information relevant to the second claim—then GMT's trade-secrets claim would now be barred. GMT filed suit in the United States (originally in Tennessee) only two days after filing suit in China, and included in the Tennessee complaint allegations accusing defendants of using GMT's confidential and proprietary information. *See, e.g.*, [1] at 5 ¶¶ 31, 36–37. GMT easily could have added those same allegations to its Chinese complaint. But if, on the other hand, the test for relatedness depends instead on whether certain facts underlying the one claim are also needed to prove the other, defendants face a much steeper climb. In China, GMT complained only about the shipment of faulty, non-conforming, and unordered goods; the purported use of GMT's confidential or proprietary information simply did not come up. And nor does GMT's trade-secrets claim appear

to rely at all on proving that DNZ shipped rusted or unordered product. Because defendants have not established that Chinese principles of *res judicata* bar GMT from moving forward with its trade-secrets claim, this claim may proceed.

## IV.    Conclusion

For the reasons discussed above, defendants' motion for judgment on the pleadings, [163], is granted in part and denied in part. The motion is granted insofar as defendants seek recognition and enforcement of the judgment rendered by the Chinese intermediate court. The CISG claim is precluded. The motion is denied as to preclusion of GMT's trade-secrets claim.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 5/1/15