## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GLOBAL MATERIAL TECHNOLOGIES, INC., a New York Corporation, | ) ) ) ) | No. 12 CV 1851 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **Magistrate Judge Young B. Kim** |
| DAZHENG METAL FIBRE CO., LTD., et al., | ) ) ) ) | |
| Defendants. | ) ) | September 23, 2015 |

### MEMORANDUM OPINION and ORDER

In this diversity suit involving the meltdown of an international business relationship, metal fiber manufacturer Global Material Technologies, Inc. ("GMT") sued Dazheng Metal Fibre Co., Ltd. ("DNZ") and Dazheng Metal Fibre Co., Ltd. d/b/a ChuanGuPing ("Tru Group"), both foreign corporations organized under Chinese law, and Chinese citizen Dong Jue Min (collectively, "the defendants"), alleging that DNZ and Tru Group misappropriated GMT's trade secrets and used GMT's confidential customer information to lure away its customers. The case is now approaching the end of the fact-discovery phase, during which GMT sought and received a number of documents that are designated as being for "Attorney's Eyes Only." Before the court are Plaintiff's Motion to Remove the "Attorneys' Eyes Only" Designations on Certain Documents Produced by Tru Group, (R. 238), and Plaintiff's Motion to Remove the "Attorneys' Eyes Only" Designations on Documents Produced by Third-Party Respondent Federal-Mogul Holdings Corporation,

(R. 246). For the following reasons, the first motion is granted and the second motion is granted in part and denied in part:

## Background

GMT originally filed this suit in the United States District Court for the Middle District of Tennessee. (R. 1.) In its amended complaint GMT identifies itself as a manufacturer of various metallic wool products that outsourced some of its manufacturing operations to DNZ from 2003 through 2007. (R. 38, Am. Compl. ¶¶ 8, 11.) GMT alleges that it was DNZ's primary customer from 1996 through 2009 and that it had a 25% ownership interest in DNZ. (Id. ¶¶ 12-13.) It alleges that by way of this "unique business relationship" DNZ gained access to GMT's confidential and proprietary customer information and competitive pricing strategies. (Id. ¶¶ 15, 18.) GMT alleges that DNZ eventually "usurped this information and used it to identify and contact GMT customers" and ultimately offered them "a pricing scheme based upon GMT's confidential pricing scheme." (Id. ¶ 19.) According to GMT, "DNZ, through Tru Group, and possibly through other subsidiary companies of DNZ, including but not limited to Seamarky Industrial, Ltd., used (and still uses) its confidential knowledge of GMT's pricing scheme in determining the pricing scheme it offered (and still offers) to GMT customers." (Id. ¶ 45.) These allegations form the basis of GMT's claim that the defendants violated the Uniform Trade Secrets Act. (Id. ¶¶ 113-118.)

About a year after the suit was filed, the court in Tennessee entered a two-tiered protective order that had been agreed to by the parties. (R. 50.) The

protective order limits the disclosure of confidential material—defined as "any document, testimony, statement and/or information produced pursuant to discovery requests and/or revealed during depositions in this matter"—to the parties, potential and retained expert witnesses, attorneys of record, and counsel's staff personnel on a need to know basis. (Id. ¶¶ 1-2.) Additionally, the protective order allows the parties to designate confidential material as "attorneys' eyes only" where:

> the disclosing party and its counsel believe in good faith that the material contains proprietary information . . . including but not limited to material constituting or containing trade secrets or other confidential research, development, financial, or commercial information, that the disclosing party reasonably believes is of such a nature and character that unlimited disclosure of such information to the receiving party will be harmful to the disclosing party or to its business or will provide the receiving party a competitive advantage over the disclosing party.

(Id. ¶ 3.) Three months after the court entered the protective order, in March 2012, the court granted DNZ's motion to transfer the case to the Northern District of Illinois. (R. 67.) In the course of discovery this court recognized that the protective order entered in the Middle District of Tennessee "is still in full force and effect." (R. 154.)

According to the briefs the parties submitted in connection with the current motions, in July 2014 Tru Group produced two groups of documents labelled with the attorneys' eyes only ("AEO") designation. The first group consists of email correspondence dated from October 2009 through April 2010 between a former Tru Group sales employee and third-party customer Federal-Mogul Corporation. (R. 238, Pl.'s Mem. at 2 & Sealed Ex. A.) The second group consists of about 60

pages of invoices dated from July 2010 through August 2011 between Tru Group and Federal-Mogul and its affiliates. (Id. at 2 & Sealed Ex. B.) Both groups of documents convey then-contemporaneous pricing information, payment terms, and general identification of product specification numbers. Additionally, during discovery Federal-Mogul has produced approximately 520 documents under the AEO designation consisting of invoices and communications conveying pricing, payment terms, testing, and product specifications for GMT, DNZ, and non-party Seamarky, along with internal Federal-Mogul documents that convey information regarding, among other things, its supplier selection process, pricing, and purchasing strategies. (R. 260, Federal-Mogul Resp. at 4.) In the current motions, GMT seeks an order removing the AEO designation from the documents produced by the defendants and Federal-Mogul, arguing that the "confidential" designation is sufficient to protect their legitimate interests.

## Analysis

Federal Rule of Civil Procedure 26(c)(1) allows a court to, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." But because there is a "presumption of public access to discovery materials," the court is required to make a good-cause determination before entering a protective order shielding relevant information from public disclosure. *Citizens First Nat'l Bank of Princeton v.*

*Cincinnati Ins. Co.*, 178 F.3d 943, 946 (7th Cir. 1999). As the Seventh Circuit has recognized, "[m]any a litigant would prefer that the subject of the case—how much it agreed to pay for the construction of a pipeline, how many tons of coal its plant uses per day, and so on—be kept from the curious (including its business rivals and customers), but the tradition that litigation is open to the public is of very long standing." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000). Accordingly, the party seeking a protective order must show specific facts showing good cause to justify the protective order. *Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 300, 303 (N.D. Ill. 1993).

Once a protective order has been entered, the party seeking to protect documents under its shield "must continue to show good cause for confidentiality when challenged." *In re: Bank One Securities Litig. First Chi. Shareholder Claims*, 222 F.R.D. 582, 586 (N.D. Ill. 2004). To make that showing, the designating party must show that disclosure will result in a "clearly defined and serious injury," by pointing to "specific demonstrations of fact." *In re: Aqua Dots Prods. Liab. Litig.*, 08 CV 2364, 2009 WL 1766776, at *1, *4 (N.D. Ill. June 23, 2009) (quotations omitted). The "harm must be significant, not a mere trifle." *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3rd Cir. 1986). Conclusory statements—including "broad allegations of potential harm" or competitive injury—are insufficient to meet the good cause standard. *Chicago Mercantile Exch., Inc. v. Technology Research Grp., LLC*, 276 F.R.D. 237, 241 (N.D. Ill. 2011); *Culinary Foods,* 151 F.R.D. at 303. "If

there is any doubt as to whether the material should be sealed, it is resolved in favor of disclosure." *In re: Bank One*, 222 F.R.D. at 586.

Although two-tiered protective orders contemplating that some documents will be produced with a heightened AEO designation are not uncommon, the AEO designation should "only be used on a relatively small and select number of documents where a genuine threat of competitive or other injury dictates such extreme measures." *Team Play, Inc. v. Boyer*, No. 03 C 7240, 2005 WL 256476, at *1 (N.D. Ill. Jan. 31, 2005). The AEO designation must be used selectively because discovery and trial preparation are made significantly more difficult and expensive when an attorney cannot make a complete disclosure of relevant facts to a client and because it leaves the litigant in a difficult position to assess whether the arguments put forward on its behalf are meritorious. *Motorola, Inc. v. Lemko Corp.*, 08 CV 5427, 2010 WL 2179170, at *5 (N.D. Ill. June 1, 2010). To justify the AEO designation, the designating party must do more than show that it is a competitor of the receiving party or that the documents in question disclose information about the designating party's relationships with other competitors. *Id.* at *4. Instead, the designating party needs to show that the disclosure of the particular AEO-designated materials to even a small number of the other party's personnel would risk the disclosure of sensitive competitive information. *Id.* Conclusory statements are insufficient to show that a "slight expansion of disclosure" puts the designating party at an appreciable risk. *Id.*

## A.    Tru Group Documents

In the motion directed at Tru Group's document production, GMT seeks an order removing the AEO designation from two groups of documents consisting of correspondence, packing lists, and invoices between DNZ and Federal-Mogul during the period from 2009-2011.    It seeks to have the defendants produce these documents subject to the less restrictive "confidential" designation.  (R. 238.)  GMT argues that the AEO designation is unjustified because the years-old pricing and specification information conveyed in the two groups of documents is stale and will not give GMT any competitive advantage in the current marketplace.  It also argues that DNZ and Tru Group are no longer competitors with GMT, based on representations made by the defendants during discovery.  Specifically, it points to an underlying discovery dispute stemming from the defendants' admission that their document production was impacted by their decision to "liquidate" their computers in connection with what they described as "the process of winding down" DNZ and Tru Group, a process that began after this suit was filed.  (Id. Ex. C, March 10, 2015 Ltr. at 3.)  In a statement they filed with this court explaining that decision, the defendants represented that "[i]n March 2011, DNZ and Tru Group began to wind down their business operations" and "DNZ ceased exporting manufactured products."  (Id.)  They further represented that in September 2011 Tru Group "ceased all export sales" and in June 2011 "DNZ terminated its sales force and its relationships with independent sales representatives."  (Id.)   The defendants also stated that DNZ and Tru Group "ceased all manufacturing

operations" in 2013. (Id. at 1.) Based on these representations, GMT argues that the AEO designation cannot be justified because by definition there can be no competitive threat to the defendants if they are no longer operating.

In attempting to meet its burden as the designating party to show that there is good cause for maintaining the AEO designation on the challenged groups of documents, Tru Group has made only the kinds of broad allegations of unspecified harm that consistently have been found insufficient to justify the "extreme measure" of preventing a party's attorneys from sharing the documents with their clients. *See Team Play,* 2005 WL 256476, at *1. Tru Group's response to the current motion hinges on three blanket good-cause statements: (1) that disclosing the documents to "GMT employees would harm the business of both Tru Group and Federal-Mogul by causing GMT to gain an unearned competitive advantage over Tru Group"; (2) that disclosure would give GMT "unfair leverage over negotiations with Federal-Mogul"; and (3) that disclosure would harm Tru Group's relationship with Federal-Mogul. (R. 245, Defs.' Resp. at 1, 3.) Nowhere in its eight-page response does Tru Group elaborate on these assertions or describe with any particularity how these generalized harms would arise from allowing GMT's attorneys to review the documents with a limited number of GMT employees. In particular, it has not addressed in any meaningful way GMT's argument that this information is stale. Instead, it simply asserts that "GMT has cited no evidence that the pricing information is in fact stale." (Id. at 4.) But as the party seeking to prevent GMT from reviewing the documents, it is Tru Group's burden, not GMT's,

to establish good cause and explain with particularity why the information is not stale. *See Motorola,* 2010 WL 2179170, at *4.

With respect to the staleness question, Tru Group has not explained with any particularity how allowing GMT employees to view years-old invoices and specifications could give GMT any unfair competitive advantage in the current market or lead to unfair leverage over the customers identified in the documents. Nor has it submitted any affidavits supporting its assertions. The relevant documents are all dated between October 2009 and August 2011, making even the most recent pricing data conveyed therein more than four years old. (R. 238, Pl.'s Mem. Sealed Exs. A & B.) Tru Group has not explained how four year-old pricing information could cause the kind of "unwarranted commercial harm" that would justify preserving its AEO designation. *See Aqua Dots*, 2009 WL 1766776, at *2; *see also In re: Bank One*, 222 F.R.D. at 588 (noting that party "must attempt to winnow out properly confidential information in order to justify sealing" (internal quotation omitted)); *United States v. Int'l Bus. Mach. Corp.*, 67 F.R.D. 40, 46 (S.D.N.Y. 1975) (noting that "disclosure of two-and-a-half-year-old sales data" will not result in a "clearly defined, serious injury"). Particularly, Tru Group has made no attempt to show that the information in these documents could be extrapolated by GMT to predict future pricing strategies or otherwise give it a current competitive advantage. *Contrast with Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 1:09-cv-00560-LJO-BAM, 2012 WL 6160468, at *2 (E.D. Cal. Dec. 11, 2012). In short, Tru Group's broad allegations of harm are insufficient to show that the years-old

information poses any on-going competitive threat to the defendants or any unwarranted commercial advantage to GMT. *See Chicago Mercantile Exchange*, 276 F.R.D. at 241.

Even assuming for the purposes of argument that Tru Group had established that the years-old information is not stale, there remains the disturbingly murky question regarding whether Tru Group and DNZ still can be considered competitors with GMT. In other words, given what can only be described as vague and shifting explanations the defendants have given as to whether Tru Group and DNZ are still functioning companies, the court is unable to determine whether the AEO-designated information has any on-going value to either company. As GMT points out, and as noted above, on March 10, 2015, the defendants filed a statement with this court in response to GMT's request for more information as to why they had produced so few documents from electronic storage devices in response to GMT's discovery requests. (R. 238, Pl.'s Mem. Ex. C, March 10, 2015 Ltr.) The defendants explained the paltry production by admitting that they had "liquidated" their computers as part of a "winding down" process that began in March 2011. (Id. at 3.) Nowhere in that letter did the defendants suggest that the "winding down" process had been reversed or that they were continuing to operate. In its response to the current motion, Tru Group asserts that nothing in the letter "indicates that DNZ and Tru Group do not intend to re-start their operations upon resolution of this litigation." (R. 245, Defs.' Resp. at 4.) Actually, that is exactly the impression that the letter gave. If DNZ and Tru Group foresaw a possibility that their businesses

were merely on hold temporarily, why would they "liquidate" their equipment? The impression the letter was no doubt intended to, and in fact did, convey was that DNZ and Tru Group liquidated their computers because they had gone out of business. And yet now, faced with the persuasive argument that disclosure of the AEO-designated documents could provide no competitive disadvantage to defunct companies, Tru Group now says that the defendants "continue to do some business—and nothing indicates that they will not resume full production." (Id.) It is hard not to see this assertion as an about-face in the defendants' representations to this court.

The defendants' obligation to justify the continued AEO designation in the face of GMT's challenge is to identify a clearly defined and serious injury. *See Aqua Dots*, 2009 WL 1766776, at *1. Given Tru Group's failure to explain why the data should not be considered stale, let alone support that explanation with evidence, coupled with what can only be described as the defendants' shifting position with respect to DNZ's and Tru Group's operational status, the court is unable to give them the benefit of the doubt with respect to their statements regarding the competitive disadvantage at stake in downgrading the two relevant groups of documents from AEO to confidential status. *See id.* at *2 (noting that allegations of "competitive disadvantage" not enough to show good cause). Those conclusions leave the court only with Tru Group's assertion that good cause exists because the documents are protected by the confidentiality clause in a supply agreement between Tru Group and Federal-Mogul. Specifically, under the supply agreement

Tru Group and Federal-Mogul agreed "not to disclose the terms and conditions of this Agreement to any third party without obtaining written prior consent of the other party." (R. 245-2, Defs.' Resp. Ex. B ¶ 16.10.)

There are several reasons why Tru Group's reliance on the supply agreement in this context does not help it to meet the good cause threshold. First, the mere existence of a confidentiality agreement is not in itself a valid reason to object to discovery. *See JAB Distribs., LLC v. London Luxury, LLC*, 09 CV 5831, 2010 WL 4008193, at *4 (N.D. Ill. Oct. 13, 2010) ("Defendant proffers no case in support of its argument that a confidentiality agreement precludes a party from producing documents pursuant to a protective order."); *Mike v. Dymon, Inc.*, 95-2405-EEO, 1996 WL 606362, at *3 (D. Kan. Oct. 17, 1996) ("That plaintiff may have a contractual, legal obligation not to reveal confidential information of [third-party] is not a valid objection to the requested discovery."). Second, it appears that Tru Group is balancing its argument on an assertion of Federal-Mogul's confidentiality rights. For example, it argues that Federal-Mogul "continues to expressly assert its right to maintain the most restrictive designation" for this information, pointing to a November 2014 letter in which counsel for Federal-Mogul asserted that the continued AEO designation is proper. (R. 245, Defs.' Resp. at 4-5.) But Tru Group has not shown that it has standing to assert Federal-Mogul's confidentiality interests. *See Krumwiede v. Brighton Assoc., LLC*, 05 CV 3003, 2006 WL 2644952, at *2-*3 (N.D. Ill. Sept. 12, 2006). Federal-Mogul has not moved to intervene in the case to respond to the current motion and Tru Group has not attempted to show

that it has standing to advocate a non-party's confidentiality position. *See id.* Third, Tru Group's assertion that Federal-Mogul has not agreed to remove the AEO designations from the documents relevant to this motion appears to stand on shaky ground. (R. 245, Defs.' Resp. at 5 n.1.) Not only did Federal-Mogul lodge no objection to the current motion with this court, but in its response to the second motion seeking to redesignate AEO documents from its own production (discussed in Section B below), Federal-Mogul suggests that the barrier to removing the AEO designation on DNZ documents has been erected by the defendants. Specifically, it states that "DNZ has denied Federal-Mogul's requests to waive the confidentiality provision and/or approve of any attempt to remove the AEO designation" with respect to DNZ pricing and payment documents. (R. 260, Federal-Mogul Resp. at 14.) That assertion suggests that the defendants are pointing to Federal-Mogul's confidentiality rights as a shield despite Federal-Mogul's willingness to waive those rights with respect to at least some subset of DNZ documents. For all of these reasons, Tru Group has not shown that its obligations under the supply agreement present good cause to prevent the redesignation of the two groups of documents at issue here.

It is important to note that an additional consideration in determining whether the continued AEO designation is appropriate is to weigh the risks to the defendants from disclosure against GMT's need to view the information in order to litigate its claims. *See Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 412 (N.D. Ill. 2006). Great care must be taken to prevent the

unnecessary curtailment of a party's trial preparation. *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985). But trial preparation and trial itself are made significantly more difficult and expensive when a party's attorney is unable to share with the party facts that are material to its prosecution of the case. *See Motorola*, 2010 WL 2179170, at *5. That is especially true here, where GMT's claims turn in part on whether it can prove that the defendants misappropriated its customer and pricing information in an attempt to lure away its business. (See, e.g., R. 38, Am. Compl. ¶ 104.) As GMT points out, the disputed documents are relevant to helping it determine the scope of its claims. Tru Group argues that GMT can get around this problem by preparing lists of its historic pricing structures for its counsel to compare to the AEO-designated documents. (R. 245, Defs.' Resp. at 7.) While that approach might work in some contexts, because Tru Group has not convincingly shown that it will be harmed by allowing GMT representatives to view these two groups of documents, it has not shown that the added difficulty and expense inherent in its proposal are justified. That said, this court is sensitive to the need to protect commercial information and agrees that the two groups of documents relevant here should maintain their "confidential" status under the first tier of the protective order.

## B.    Federal-Mogul's Documents

In its related motion targeting documents produced by Federal-Mogul, GMT argues that Federal-Mogul improperly designated 2,800 pages of its 6,480-page document production as AEO. (R. 246, Pl.'s Mem. at 2.) The AEO-designated

documents include invoices dated April-May 2010 for DNZ products shipped by Tru Group to Federal Mogul and dated between September 2011 and 2013 for DNZ products shipped by Seamarky to Federal-Mogul, as well as internal and external communications between Federal-Mogul and Delano Mok or Alex Chan regarding shipments, and pricing of DNZ products or otherwise regarding Federal-Mogul's commercial relationship with DNZ and Seamarky. (Id. at 2-3.) According to Federal-Mogul's response, however, only three categories remain in dispute: (1) documents revealing DNZ pricing, payment terms, testing, and product specifications; (2) similar documents as category (1) pertaining to Seamarky; and (3) documents that convey Federal-Mogul's supplier selection process, purchasing strategies, and procedures for commodity purchasing, testing, specifications, and purchasing frequency. (R. 260, Federal-Mogul Resp. at 4.) GMT provided this court only with samples of the AEO-designated documents (filed under seal). That sampling is sufficient because "[c]ourts are not required to make good cause determinations on a document-by-document basis as such a requirement would impose an excessive burden upon the court in cases with thousands of documents at issue." *In re: Northshore Univ. Healthsystem*, 254 F.R.D. 338, 342 (N.D. Ill. 2008).

Because Federal-Mogul is not a party to this lawsuit, the good-cause showing it must make in defense of its AEO designation is less demanding than the burden shouldered by the defendants. *See Federal Trade Comm'n v. OSF Healthcare Sys.*, 11 CV 50344, 2012 WL 1144620, at *1 (N.D. Ill. Apr. 5, 2012). A relaxed good-cause standard is necessary because "[n]on-party organizations are limited in their ability

to control the manner in which parties use their confidential commercial documents." *In re: Northshore*, 254 F.R.D at 343. In other words, because a non-party is not physically present to protect its confidential information during court proceedings and depositions, it "will invariably risk a greater potential for injurious disclosure than parties." *Id.* Having considered its arguments with respect to each category of disputed documents, this court concludes that Federal-Mogul has persuasively met its reduced good-cause burden with respect to the majority of the documents it produced subject to the AEO designation.

### 1. DNZ Documents Located in Group Exhibit A

GMT first seeks to remove the AEO designation from a group of documents it filed under seal as Group Exhibit A, pertaining to invoices, product quality analyses, and product-related communications between DNZ and Federal-Mogul. These documents include invoices and packing lists conveying information that is substantially similar, but not identical, to the documents at issue in the motion addressed in Section A of this opinion.[1] In fact, GMT simply adopts its arguments set forth in the previous motion in support of its motion to remove the AEO designation from this group of Federal-Mogul documents. (See R. 246, Pl.'s Mem. at 7.) As described in Section A above, the court is granting the motion directed to the documents produced by Tru Group because in responding to GMT's motion Tru

---

[1] Despite the similarity among the documents in Exhibit B filed with GMT's first motion and Group Exhibit A filed with the current motion, this court's review reveals no overlap among those documents. In other words, from the sample GMT provides here, it appears that none of the documents that this court is ordering redesignated with respect to the first motion are part of the production Federal-Mogul seeks to protect with the AEO designation in response to the current motion.

Group failed to make the requisite good-cause showing in defense of its AEO designation. But in contrast to Tru Group's submission, which conveyed only conclusory assertions in support of Tru Group's AEO designations, Federal-Mogul's submission amply demonstrates the current competitive harm potentially caused by a court order redesignating the AEO-designated documents sampled in Group Exhibit A. That evidence comes in the form of an affidavit from its Purchasing Plant Manager, Allen Cleveland. (R. 260-4, Federal-Mogul Resp. Ex. C, Cleveland Aff.) In that affidavit Cleveland explains that internal decisions and business strategies regarding the supply of steel fibers remain relevant today even if the documents are five to seven years old. (Id. ¶ 6.) Specifically, he explains that there are only eight to ten global suppliers in the steel fibers market offering that commodity during any given year. (Id. ¶ 7.) Cleveland explains that because steel fiber prices vary among suppliers yearly, Federal-Mogul issues worldwide requests for quotes on an annual basis. (Id.) He asserts that disclosure of Federal-Mogul's confidential purchasing and supplier quality information would harm Federal-Mogul by jeopardizing the competitive bidding process among its suppliers. (Id. ¶¶ 9-10.) According to Cleveland, even the historic information would provide GMT with an unfair insight into business dealings of non-party suppliers in a way that could distort current bidding processes. (Id.) This evidence is sufficient to satisfy Federal-Mogul's lower burden to show that there is good cause supporting its AEO designation with respect to the documents in Group Exhibit A. *See Federal Trade Comm'n*, 2012 WL 1144620, at *1.

Because Federal-Mogul established good cause, the burden shifts to GMT as the party seeking discovery "to show why the court should allow dissemination of the materials." *See Culinary Foods*, 151 F.R.D. at 300. GMT makes two points that weigh in favor of reducing the Group A designation from AEO to confidential. First, as described above, GMT points to Federal-Mogul's assertion that "DNZ has denied Federal-Mogul's requests to waive the confidentiality provision and/or approve of any attempt to remove the AEO designation." (R. 260, Federal-Mogul Resp. at 14.) This assertion suggests that DNZ is using its confidentiality agreement with Federal-Mogul to cloak information that Federal-Mogul otherwise would be willing to redesignate, even though it is unclear whether and to what extent DNZ remains in the business of manufacturing, exporting, or selling metal fibers. Second, GMT submitted with its motion Group Exhibit F, which includes a series of packing lists, invoices, and product analyses that are substantively similar to those represented in Group Exhibit A, except they are dated September and October 2010 instead of April and May 2010. (R. 246, Pl.'s Mem. Sealed Group Exs. A & F.) Despite their substantive similarity, Federal-Mogul produced the documents in Group Exhibit F with only the confidential designation. In its response to GMT's motion, Federal-Mogul ignores this inconsistency and fails to explain why it assigned differing designations to groups of documents that appear to convey the same kinds of substantive information. As GMT points out, it has a substantial interest in being able to view these documents with its attorneys because the information conveyed therein goes to the heart of its trade secrets claims. For these reasons, GMT has

shown that the documents in Group Exhibit A should be redesignated as confidential.

## 2. Seamarky Documents Located in Group Exhibit B

Next GMT seeks removal of the AEO designation from a group of documents filed under seal at Group Exhibit B, pertaining to Federal-Mogul's supply arrangements with Seamarky, a non-party competitor of GMT. GMT admits that these documents reveal pricing strategies, product characteristics, and/or supply quantity and quality data, but argues nonetheless that they do not qualify for AEO protection because it insists that they are stale. As noted above, Cleveland's affidavit provides support for Federal-Mogul's AEO designation under the lower good-cause threshold for non-parties, because his statements provide evidence that despite their age the relevant documents could skew current negotiations and strategies in the relatively limited global supply market for metal fiber. Moreover, GMT does not dispute that Seamarky is currently its direct competitor. Courts have made clear that the AEO designation is particularly appropriate in situations where the confidential information might otherwise be used to gain a commercial advantage by a direct competitor. *See, e.g., In re: Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 11 CV 5468, 2013 WL 6490343, at *4 (N.D. Ill. Dec. 10, 2013).

GMT also argues that redesignation of Group Exhibit B is appropriate because, according to it, the documents "raise grave questions concerning the veracity" of the defendants' representations that they are unrelated to Seamarky. (R. 246, Pl.'s Mem. at 9.) Although GMT acknowledges that Federal-Mogul and

Seamarky are both non-parties who have a confidentiality agreement that governs the AEO-designated documents, it asserts that the defendants could give approval to waive the designation given what it describes as "unassailable evidence" that Seamarky and the defendants are affiliated. (Id. at 8.) But the current motion does not provide an appropriate forum for this court to decide the substantive issues surrounding whether Seamarky is an extension of the defendants' businesses. Although the Group Exhibit B documents may be relevant to this aspect of GMT's claim, they undeniably convey the kind of substantive pricing and supply information that is appropriate for AEO designation, and Federal-Mogul has adequately rebutted GMT's argument that the information is stale. Moreover, with respect to this group of documents the competitive risk to Federal-Mogul and Seamarky that stems from disclosure outweigh the need for GMT's attorneys to share the documents with their client in order to analyze GMT's claim regarding the alleged overlap between Seamarky and the defendants. Accordingly, the motion is denied with respect to the documents filed under seal in Group Exhibit B.

### 3. Federal-Mogul Communications Located in Group Exhibits C and D

Given the lower good-cause threshold that applies to non-party Federal-Mogul, *see Northshore*, 254 F.R.D at 342-43, Cleveland's affidavit is sufficient to demonstrate that Federal-Mogul had good cause to produce most of the documents sampled in GMT's Group Exhibits C and D under the AEO designation. These documents generally consist of communications between Federal-Mogul and the defendants' representatives Delano Mok and Alex Chan regarding DNZ products

and internal Federal-Mogul communications relating to its decision to purchase products from the defendants and Seamarky in 2009 and 2010. In attempting to illustrate that these communications are either stale or otherwise inappropriately designated as AEO, GMT directs specific arguments to a sampling of small groups of these communications. For example, GMT quotes fairly extensively from a set of emails between Mok and Federal-Mogul dated December 2009 through May 2010, produced at FM 6004-6011, to argue that these communications are merely "embarrassing" to the defendants but "not so sensitive that they merit a heightened AEO designation." (R. 246, Pl.'s Mem. at 12.) But those emails reveal the kinds of price proposals, pricing formulas, and product specifications that courts have found deserving of AEO status. *See, e.g., Stanislaus*, 2012 WL 6160468, at *5. Given Cleveland's representations that this information can reverberate in the current market, the court is unable to conclude that they are stale. Similarly, GMT challenges Federal-Mogul's internal report analyzing its decision to change suppliers in 2010 and an email discussing that report, produced at FM 6066-6088. (R. 246, Pl.'s Mem. at 13-14.) But because these documents convey Federal-Mogul's supply strategies and product requirements, their disclosure is also potentially harmful to the extent they can be interpreted to predict its future purchasing strategies, as Cleveland's affidavit suggests. *See Stanislaus*, 2012 WL 6160468, at *2 (noting that historical information is not stale if it "can be extrapolated to predict future strategies and practices").

Federal-Mogul has not made a convincing argument, however, as to why there is good cause to maintain the AEO designation for the documents produced in Group Exhibit C at FM 6107 and 4090-4093. As GMT points out, these emails convey a discussion about a change in Federal-Mogul's supplier but they do not reveal any product information, pricing details, or sourcing strategy. In defense of its AEO designation Federal-Mogul argues that the emails reveal how a supplier's location impacts its sourcing decisions. (R. 260, Federal-Mogul Resp. at 10.) But nothing in the emails comes close to a reveal of strategy. Instead, the documents convey only employees' attempts to get to the bottom of what appears to have been a supply reporting mistake. This is not the kind of highly sensitive commercial information that justifies the "extreme measure" of an AEO designation. *See Team Play*, 2005 WL 256476, at *1.

Additionally, it must be noted that GMT's challenge to the AEO designation of two sub-sets of documents within Group Exhibits C and D have gone unanswered by Federal-Mogul in its response. GMT points out that Federal-Mogul produced an agreement dated November 14, 2013, in two separate places in its production, one under the AEO designation and one labelled only "confidential." (R. 246, Pl.'s Mem. Ex. D at FM 3660-3662 & FM 0003-0004.) Similarly, GMT points out that Federal-Mogul produced a series of emails twice, once at FM 3636-3643 under the "confidential" label and once at FM 4156-4162 with the AEO designation.[2] Because

_____

[2] There are small differences in one of the emails in this duplicate email string (compare FM 003636-003638 with FM 004156-004157), but the version produced under the confidential designation is the more detailed version. The information in

Federal-Mogul's response is silent with respect to this point, the court agrees with GMT that the AEO designation on these duplicated documents should be removed.

Finally, the court notes that in its response Federal-Mogul requests an order requiring GMT to reimburse it for the fees and costs it incurred in responding to the current motion and any future document redesignations. (R. 260, Federal-Mogul Resp. at 14-15.) But because the court has determined that a portion of its AEO designations are to be reduced to confidential status, and because Federal-Mogul has cited no cases supporting an argument that it is entitled to fees and costs in this specific context, that request is denied. Going forward, however, GMT should identify for Federal-Mogul which documents it considers improperly designated in light of this opinion before engaging in dialogue to discharge its meet and confer obligations under Federal Rule of Civil Procedure 37(a)(1) and Local Rule 37.2.

## Conclusion

For the foregoing reasons, Plaintiff's Motion to Remove the "Attorneys' Eyes Only" Designations on Certain Documents Produced by Tru Group is granted. The documents filed under seal as Exhibits A and B to that motion, (R. 238-1; R. 238-2), are to be treated as "confidential" under the protective order as of October 8, 2015, as long as the defendants have not filed an objection to this ruling pursuant to Rule 72(a). Plaintiff's Motion to Remove the "Attorneys' Eyes Only" Designations on Documents Produced by Third-Party Respondent Federal-Mogul Holdings Corporation is granted in part and denied in part. The motion is granted with

---

the version produced as AEO at FM 004156 and 004157 appears in the version produced as confidential at FM 003636 through 003637.

respect to the documents filed as Group Exhibit A, the documents filed in Group Exhibit C as FM 6107 and 4090-4093, and the documents filed in Group Exhibit D as FM 3660-3662 and FM 4156-4162. Those documents are to be treated as "confidential" under the protective order as of October 8, 2015, as long as Federal-Mogul has not filed an objection to this ruling pursuant to Rule 72(a). The motion is denied in all other respects.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**