GLOBAL MATERIAL TECHNOLOGIES, INC.,

        Plaintiff,

   v.

DAZHENG METAL FIBRE CO. LTD.,
DAZHENG METAL FIBRE CO. LTD. d/b/a
ChuanGuPing a/k/a TRU GROUP, and
DONG JUE MIN,

        Defendants.

No. 12 CV 1851

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

For years, Global Material Technologies maintained a close business relationship with Dazheng Metal Fibre Co. (DNZ), a Chinese company. The relationship eventually disintegrated, however, and in 2011 GMT sued DNZ in both the United States and China. The Chinese court entered judgment before the domestic case was transferred to this district, and several of GMT's claims were dismissed at the pleadings stage. But its trade-secrets claim remained, and the parties engaged in discovery on that issue. Citing repeated abuses of the discovery process by defendants (which include DNZ's general manager, Dong Jue Min, and its wholly-owned subsidiary, Tru Group), GMT moved for a default judgment. Defendants opposed the motion, and filed their own motion for summary judgment. For the reasons discussed below, GMT's motion for default is granted, and defendants' motion for summary judgment is denied as moot.

# I.       Legal Standard

The district court may sanction a party that has failed to take reasonable steps to preserve electronically stored information if that information should have been preserved during the litigation, but it has been lost and cannot be restored or replaced through additional discovery. Fed. R. Civ. P. 37(e). If another party was prejudiced by the loss of the information, the court may order measures necessary (but no greater than necessary) to cure the prejudice. Fed. R. Civ. P. 37(e)(1). Alternatively, if the court finds that the party that lost the information did so intentionally in order to deprive the other party of the information's use, the court may: presume that the information was unfavorable to the first party; instruct the jury that it may (or must) presume that the information was unfavorable to the first party; or dismiss the action or enter a default judgment. Fed. R. Civ. P. 37(e)(2).[1] Default judgment is an appropriate sanction where: (1) there is "a clear record of delay or contumacious conduct"; (2) less drastic sanctions have proven ineffective; or (3) a party has demonstrated willfulness, bad faith, or fault. *Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014) (quoting *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003); *In re Thomas Consol. Indus., Inc.*, 456 F.3d 719, 724 (7th Cir. 2006)).

---

[1] The current version of Federal Rule of Civil Procedure 37, as cited above, took effect on December 1, 2015. The current version of the Rule is applied to pending cases unless it would not be "just and practicable" to do so. *See* April 29, 2015 Order of the Supreme Court of the United States, available at https://www.supremecourt.gov/orders/courtorders/ frcv15(update)_1823.pdf (last visited September 12, 2016); *cf. Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 583 (7th Cir. 2008). As no such concerns are present here, and defendants have not objected to the application of the Rule as amended, I refer in this opinion only to the current version of Rule 37.

## II.    Background

### 1.    *GMT's Suits Against DNZ*

GMT is an American company that manufactures and sells metallic-wool products, including steel fibers. In February 2011, GMT sued DNZ—a Chinese company with whom GMT had contracted for the supply of such fibers—in both the United States Court for the Middle District of Tennessee and the Zhuhai People's Court of Guangdong Province, China. In the Chinese action, GMT alleged that DNZ had breached the parties' supply agreement by shipping to GMT (or to GMT's customers) rusted product, product that did not otherwise comply with GMT's purchase orders, and product that GMT had never ordered. GMT included similar allegations in the United States litigation, but added claims concerning the purported use of GMT's confidential information. According to GMT, it had shared with DNZ the former's pricing strategies, confidential customer list, and internal operating procedures—but with the clear understanding that DNZ would not disclose this information to third parties or use it to GMT's disadvantage. GMT believed that DNZ had violated this understanding, and had created in secret a subsidiary, Tru Group, through which DNZ had attempted to take over GMT's customer base. GMT named Tru Group and DNZ's general manager, Dong Jue Min, as additional defendants to the United States action.

The latter was ultimately transferred to the Northern District of Illinois. Before the transfer, however, the Chinese trial court entered judgment in the

lawsuit there.[2] The Chinese trial court concluded that GMT had failed to prove there were any quality issues with DNZ's shipments, and that DNZ also was not liable for shipping product that did not adhere to GMT's orders. DNZ had agreed to the return of certain goods, though, and so was obligated to refund the cost of those goods. But DNZ's obligations would be offset—and then some—by GMT's own obligations. The trial court agreed with DNZ that the American company owed some $1 million in outstanding balances in related costs. The Chinese court of appeals affirmed in large part the lower court's judgment, making only small adjustments to the damages calculation.

Back in the United States, DNZ sought to enforce the Chinese judgment and preclude GMT (under principles of *res judicata*) from pursuing its claims in the Northern District of Illinois. That motion was granted as to the recognition and enforcement of the judgment rendered by the Chinese intermediate court, and granted as to preclusion of GMT's contract-based claims, but denied as to GMT's trade-secrets claim. *See* [208].[3] Discovery thus proceeded on that claim.[4]

    2.    *GMT's Motions to Compel and for Default*

---

[2] For a more detailed account of the Chinese court's findings, *see* Memorandum Opinion and Order (May 1, 2015), [208].

[3] Bracketed numbers refer to entries on the district court docket. To the extent this opinion references any document previously filed under seal, the seal is lifted and the party that originally filed that document must file on the court's docket an unredacted, public version of the same. *See City of Greenville, Ill. v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014).

[4] GMT had also asserted in the United States action a civil-conspiracy claim and intentional interference with business relations. These claims were dismissed in a ruling by Judge Dow. [136] at 16–17.

In October 2014, GMT filed with Magistrate Judge Kim a motion to compel the production of materials concerning a Hong Kong company named Seamarky Industrial, Ltd. [173]. GMT believed that DNZ had established Seamarky on the sly—much as GMT believed DNZ had secretly created Tru Group—for the purpose of taking over GMT's customers without its knowledge. In response to GMT's discovery requests, however, defendants denied any connection with Seamarky, and, accordingly, having any documents concerning that company. *Id.* at 1–2, 5–6. GMT was skeptical of these answers, because it had obtained through subpoenas to some of its former customers: (1) documents linking Seamarky to Alex Chan, a DNZ sales director; and (2) records tying Seamarky to Delano Mok, a person previously identified by defendants as a Tru Group employee. *See id.* at 7–8. GMT also believed that defendants had produced an implausibly small number of documents, and questioned whether defendants had conducted a proper search for electronically stored information. *See id.* at 12–13.

Judge Kim granted the motion to compel and ordered the defendants to describe, first, the efforts they had made to date in searching for responsive records, and, second, where those records were being kept. [190]. Defendants explained in a March 2015 letter to Judge Kim that neither DNZ nor Tru Group had operated an electronic data network, server, or other storage system, and that neither had ever hosted a company e-mail system. *See* March 10, 2015 Letter to Judge Kim, [197] at 2–3. Instead, employees and "independent sales representatives" were asked to register individually for DNZ and Tru Group e-mail accounts with a cloud-based e-

mail provider in China. *Id.* at 2. Defendants did not in general have access to those accounts; however, following the production by GMT's third-party customers of e-mails referring to Alex Chan and Delano Mok, DNZ had obtained the log-in information for Chan's account. *Id.* at 4. When DNZ accessed that account, all of the e-mail folders were empty. *Id.* And Tru Group was never given access to Mok's e-mail account. *Id.* Dong Jue Min had a Yahoo!-hosted e-mail account, but those messages were likewise inaccessible because Yahoo! had stopped providing e-mail service to China in August 2013, and had at that time deleted all of its customers' accounts. *See id.* at 2.

As for other records, defendants stated that DNZ had issued some computers, but only to a select number of employees working in DNZ's "general office" and its warehouse and finance departments. *See id.* at 3. DNZ had not issued computers to any independent sales representatives (like Chan); and Tru Group had not issued any computers, period. *Id.* at 2–3.

Beginning in March 2011, said defendants, they began to wind down their business operations and, as part of that process, instructed their employees to preserve in hard copy any electronic information needed to comply with relevant record-keeping obligations in China. Defendants said that some electronic data were also transferred to a USB flash drive. *Id.* at 3. According to defendants, after the "relevant" information was printed or transferred to the flash drive, DNZ liquidated all of its computers. *Id.* In response to GMT's discovery requests (propounded in November 2011), defendants claimed that they had searched the

flash drive and all physical records. *Id.* at 4. The companies had also directed their remaining employees to search their e-mail accounts for responsive information, and had asked their former independent sales agents to do the same. *Id.* To the extent responsive records were found, said defendants, they had saved them to the flash drive or printed and retained hard copies. *Id.* at 4.

Judge Kim ordered that the flash drive be imaged by a discovery vendor and, once imaged, searched for additional responsive information. [199]. The drive was imaged and reviewed by defendants, but in an April 2015 teleconference, defendants' attorney told counsel for GMT that everything on the drive had already been produced. *See* [201] at 3; [206] at 4.

Based on, among other things, the lost computers and missing e-mail evidence, GMT moved for a default judgment under Rule 37(e) of the Federal Rules of Civil Procedure. [299]. Defendants opposed the motion and filed their own motion for summary judgment. [367].

## III. Analysis

### A. GMT's Motion for Default Judgment

Default judgment may be awarded under Rule 37(e) only where a party that lost or failed to preserve electronically stored information did so intentionally in order to prevent an opposing party from using that information in the litigation. Fed. R. Civ. P. 37(e)(2). Negligent or even grossly negligent conduct is insufficient to warrant such a severe sanction. Advisory Committee Note to 2015 Amendment to Fed. R. Civ. P. 37(e). *See also Domanus*, 742 F.3d at 301 (willfulness or bad faith is

required); *Aura Lamp & Lighting Inc. v. Int'l Trading Co.*, 325 F.3d 903, 909 (7th Cir. 2003) (citing *In re Golant*, 239 F.3d 931, 936 (7th Cir. 2001)) (same). GMT argues that default is appropriate here because, among other reasons, defendants: destroyed evidence (DNZ's computers) and refused to search other sources of electronic information (Dong Jue Min's e-mail account) until it was too late to do so; lied to GMT and to the court about defendants' (lack of) relationship with Seamarky in order to explain the absence of records concerning that company; and otherwise obstructed GMT's discovery of relevant information.

### 1. *Destruction or Loss of Electronic Information*

#### a. <u>DNZ's Computers</u>

GMT first points to the liquidation of DNZ's computers, which defendants say were sold after the businesses started winding down their operations in March 2011. That was the explanation given to Judge Kim in March 2015, at any rate. *See* [197] at 3; *see also id.* at 1, 3 (stating that DNZ stopped exporting manufactured products in March 2011, Tru Group ceased all export sales six months later, and all manufacturing operations ended in 2013). In September 2015, however, Tru Group represented (again to Judge Kim) that both companies were still doing some business and might later resume full production. *See* Tru Group's Opposition to GMT's Motion to Remove "Attorneys' Eyes Only" Designations, [245] at 4–5; *see also id.* at 5–9 (arguing against disclosure of defendants' commercial information to GMT employees because the parties were still competitors). Tru Group insisted to Judge Kim that nothing in defendants' March 2015 letter had suggested that they

"d[id] not intend to re-start their operations upon resolution of [the] litigation" with GMT. *Id.* at 5. But as Judge Kim later observed, [271] at 10, that is exactly the impression that the letter gave (and, presumably, that it was meant to give).

Defendants now contend, as they did before Judge Kim in March 2015, that the sale of the computers can make no difference to GMT, because the computers did not contain any information material to GMT's claims. *See* [352] at 10, Tr. at 9:10–:13 (stating that the computers were issued only to custodians not relevant to this case); [367] at 31 (similar). But this assertion is contradicted by statements in Dong Jue Min's declaration, which defendants have filed in opposition to GMT's current motion (and in support of their own motion for summary judgment). In his declaration, Dong says that before the computers were discarded, DNZ staff reviewed their contents and saved to a "digital storage device" copies of any documents relevant to the litigation. *See* [368-2] at 17 ¶ 49. This device, he explains, is the same one that Judge Kim ordered defendants to have imaged in March 2015. *Id.* Recall, however, that after the imaging was complete, defendants told GMT that everything on the drive had *already* been produced in discovery—meaning that the computers must have contained information responsive to GMT's discovery requests.

b.    Dong Jue Min's E-mail Account

GMT also complains that defendants failed to search the Yahoo!-hosted e-mail accounts of Dong Jue Min and his wife (the latter of whom used her account to contact potential customers for DNZ, *see* November 19, 2008 E-mail, [353] at 2).

Defendants do not dispute that they did not search these accounts, but argue that the messages in them were unavailable because Yahoo! had deleted data after discontinuing its e-mail services in China. *See* [367] at 31; *see also* March 10, 2015 Letter to Judge Kim, [197] at 2. GMT propounded its initial discovery requests in November 2011; the e-mail accounts were not shut down until August 2013. *See* [197] at 1–2, 6. Defendants have not explained why the accounts were not searched during the intervening 21 months.

Moreover, defendants expressed to Judge Kim complete surprise that Yahoo! had pulled out of China. *See* Transcript of March 12, 2015 Proceeding, [203] at 8, Tr. at 8:19–:24 ("[N]o one anticipated this situation with Yahoo!. No one foresaw that they would all of a sudden pick up and leave China. That was a surprise to everyone, . . . [s]o it would have been impossible for us to have anticipated that would occur."). But it is incredible that Yahoo! would not at least have warned its Chinese customers of an intent to erase the customers' information. Indeed, publicly-available news stories indicate that the termination of Yahoo!'s services in China was not the total shock defendants claim it was.[5] If news of the termination

---

[5]    *See, e.g.*, Channel NewsAsia, "Yahoo China to end email service," http://www.channelnewsasia.com/news/technology/yahoo-china-to-end-email/644094.html (stating that "[u]sers of the service were informed that they must register with AliCloud . . . to prevent emails and other information from being deleted when Yahoo's mail service stops") (posted April 19, 2013) (last visited September 12, 2016); Phys.org, http://phys.org/news/2013-04-yahoo-china-email.html (same) (also posted April 19, 2013) (last visited September 12, 2016); Yahoo! News, https://www.yahoo.com/news/yahoos-email-china-close-august-184221844.html?ref=gs (advising that Yahoo!'s e-mail service in China would end on August 19, 2013) (posted April 22, 2013) (last visited September 12, 2016).

broke in April 2013 (*see* note 5, below), defendants had plenty of time in which to preserve the information in the affected accounts.

C.   Other E-mail Accounts

In their March 2015 letter to Judge Kim, defendants explained that they had been unable to search other company e-mail accounts because those accounts had been registered (with a third-party provider) by the individuals who had used them, and those individuals—including, in particular, Alex Chan and Delano Mok—no longer worked for defendants. [197] at 3–4. In other words, the e-mail records were now out of defendants' control. While defendants had eventually been given access to and had searched Chan's DNZ account in September 2014 (only to find that no data remained), defendants told Judge Kim that they had never accessed Mok's e-mails. *Id.* at 4. This last statement stands in stark contrast to those made by Julia Wu, Tru Group's sales manager. In a declaration dated November 3, 2014, Wu swore under penalty of perjury that Tru Group had "searched Mr. Mok's assigned Trugroup [*sic*] email account" after GMT's customers had produced certain records in response to a subpoena. [183-2] at 2 ¶ 6; *id.* at 3. There is also evidence, discussed below, that Mok and Chan did not actually stop working for defendants in 2011, as defendants claim.

2.   *False Statements*

Defendants have maintained repeatedly, both in statements to GMT and to the court, that none of them is affiliated with, or has had any kind of a business relationship with, Seamarky Industrial, Ltd. *See, e.g.*, DNZ's Amended Responses to

GMT's November 8, 2011 Discovery Requests, [348] at 3 ¶ 13 ("DNZ . . . does not [have], and [has] never had, a business relationship with Seamarky."); DNZ's Amended Responses to GMT's July 2014 Discovery Requests, [313] at 16 ¶ 13 (same); *id.* at 10 ¶ 14 ("DNZ has no affiliation with Seamarky and is unaware of any documents which may relate to Seamarky's business other than those previously produced by third-parties pursuant to subpoena."); Shi Declaration, [183-1] at 2 ¶ 5 ("DNZ is not affiliated with, and has no ownership interest in, Seamarky . . . . DNZ has never had a business relationship with Seamarky . . . ."); November 3, 2014 Declaration of Julia Wu, [183-2] at 2 ¶ 5 (same, but concerning the absence of a connection between Seamarky and Tru Group); Transcript of February 11, 2015 Proceeding before Judge Kim, [204] at 11, 11:6–:12 (stating that none of the defendants, including Dong Jue Min, had had a relationship with or had done business with Seamarky); Defendants' Opposition to GMT's Motion for Default Judgment, [367] at 31–32 (arguing that GMT has no proof of any connection between defendants and Seamarky). GMT argues, and I agree, that defendants' claims about Seamarky are belied by the evidence obtained from some of GMT's former customers.

One such customer was Federal-Mogul. GMT originally sold to Federal-Mogul steel-fiber products made in GMT's own factory in Illinois, but around 2005 began to supply them with product manufactured by DNZ in China. *See* October 21, 2015 Deposition of Stanley Kulis, [309] at 3, Tr. at 20:6–:16. The change in manufacturer necessitated a product-quality audit by Federal-Mogul so that Federal-Mogul could

make sure its requirements would continue to be met. *See id.* at 4, Tr. at 21:3–23:12. In late December 2009, Delano Mok (one of Tru Group's sales agents) began communicating with Federal-Mogul representatives about purchasing its steel fibers directly from DNZ, through Tru Group. *See* E-mail Exchange between Mok and Chris Wilde, [315] at 3–6. Mok explained that Tru Group was authorized by DNZ to sell the latter's products overseas because DNZ had terminated its exclusive supply agreement with GMT in late 2008 (due to GMT's failure to meet its minimum-purchase obligations), and that DNZ had materials proving DNZ had been manufacturing Federal-Mogul's fibers all along. *See id.* at 2–3. In March 2011, Federal-Mogul executed a supply agreement with Tru Group. *See* [320]. Because there would be no change in product,[6] Federal-Mogul did not perform a quality audit or notify its customers of the switch. *See* Kulis Deposition, [309] at 8, Tr. at 55:1–:11; October 14, 2015 Deposition of Allen Cleveland, [308] at 10, Tr. at 70:9–:14.

A few months later, Federal-Mogul learned—one may assume from Mok—that Tru Group had established a business entity in Hong Kong called Seamarky. *See* July 1, 2011 E-mail from Derek Milliean to Allen Cleveland et al., [307] at 2. "The intent," Federal-Mogul was told, was "to eliminate [Tru Group] and replace it

---

[6] As it turned out, Federal-Mogul had never actually certified as compliant the manufacturing facility at issue, because Federal-Mogul was never told (when GMT was its supplier) that production of its fibers had moved from DNZ's plant in Zhuhai to DNZ's facility in Ma'anshan. Why Federal-Mogul was not informed of this change, or who was ultimately responsible for failing to provide this notice, is unimportant. Relevant here is that, before switching suppliers from GMT to Tru Group, the latter reassured Federal-Mogul (through Mok) that it would be receiving the same fiber product, as manufactured by DNZ, that Federal-Mogul had been using since the beginning. *See* [315] at 2–3.

with Seamarky" because customs fees and taxes were lower in Hong Kong than in mainland China, where Tru Group operated. *Id.* So Federal-Mogul exchanged its supply contract with Tru Group for one with Seamarky, effective August 1, 2011, and continued to work with Delano Mok (who continued to use his Tru Group e-mail address) as its point of contact. *See* September 15, 2011 E-mail from Mok to Susi Rivers et al., [321] at 2; September 2011 E-mails between Mok and Andrea Meyerpeter et al., [325] at 2–3 (noting that shipments made before August 31, 2011, were supplied by Tru Group, but subsequent shipments had been and would in the future be made using the company name "Seamarky Industrial Limited"); April and June 2014 E-mails between Mok and David Klemz et al., and attachments, [336] (addressing, through Mok's Tru Group e-mail account, problems with Seamarky shipments of DNZ product).

Tru Group claims that Mok left its employ in September 2011, and that Tru Group had no idea Mok was continuing to use his company e-mail account to perform work on behalf of Seamarky, a company with which Tru Group claims to have no connection. But several invoices from Mok (Dated August 14, August 29, and September 14, 2011, respectively) directed Federal-Mogul to pay Seamarky, a Hong Kong company, through *Tru Group's* bank account in mainland China. *See* [321] at 3–8. These instructions would have made no sense at all if Tru Group and Seamarky were truly unrelated.

And Mok is not the only one of defendants' "former" agents connecting defendants to Seamarky's activities. On June 17, 2011, Alex Chan sent

representatives at Honeywell, another of GMT's customers, an e-mail entitled, "Seamarky Info." [343] at 2. Chan sent the e-mail using his DNZ e-mail account, and included a signature block representing that he was a sales director of that company. He wrote:

> Enclosed please find our Hongkong [*sic*] company information for your documents . . . . I will be your first contact for the material supply.

*Id.* (The enclosure or attachment was never produced.) Defendants claim that DNZ terminated its relationship with Chan in June 2011, and that Chan, too, continued to use his company e-mail address without defendants' knowledge. But there is evidence indicating that, in 2013, Chan visited one of Federal-Mogul's facilities on behalf of both DNZ and Seamarky. *See* January 12, 2013 E-mail from David Klemz to Alex Chan et al., [334] at 2; *see also* Kulis Deposition, [309] at 17, Tr. at 125:7–:19. And when Federal-Mogul asked Chan—also in 2013—to clarify his role at DNZ, Chan replied that he was a "sales manager" for that company. *See* March 16, 2013 E-mail from Randall Gibbs to Chan et al., [335] at 2; March 17, 2013 E-mail from Chan to Gibbs et al., *id.*

The evidence produced by Federal-Mogul further suggests that the product Federal-Mogul was receiving through Seamarky was indeed manufactured by DNZ. *See* Attachments to April and June 2014 E-Mails, [336] at 4–8, 11–22, 25–26 (showing DNZ-marked packaging with Seamarky shipping labels attached); Kulis Deposition, [309] at 13–14, Tr. at 80:19–22, 81:24–84:23 (stating that in July 2012, a Federal-Mogul employee completed a product-quality audit at a DNZ manufacturing plant in Ma'anshan, China); 2012 Product Process Audit Report,

[332] at 2 (listing Seamarky Industrial as the supplier for product made at the Ma'anshan DNZ plant).[7] And still more names from DNZ's purported past continued to pop up in Federal-Mogul's document production. A 2012 audit report listed Federal-Mogul's "[s]upplier contact" (*i.e.*, Seamarky contact) as Xie Ying— otherwise known as Grace Xie—DNZ's marketing manager and Tru Group's manager of operations. *See* [332] at 1; DNZ's Amended Responses to GMT's July 2014 Discovery Requests, [313] at 12 ¶ 1; Dong Declaration, [368-2] at 8 ¶ 20; *id.* at 11–12 ¶¶ 31–32. Defendants say that Xie resigned from DNZ and Tru Group on June 25, 2011. Dong Declaration, [368-2] at 14 ¶ 38. But Xie was still using her DNZ e-mail address and DNZ's fax number more than a year later. *Compare* [332] at 1 (listing Xie's fax number in 2012) *with* June 17, 2011 E-mail from Alex Chan, [343] at 2 (providing DNZ's fax number in June 2011) *and* http://www.dnz-inc.com/ec1.html (listing the same, but as DNZ's telephone number) (last visited September 12, 2016).

The evidence from GMT's customers clearly connects defendants to Seamarky Industrial, such that defendants' claims to the contrary are not credible. Defendants

---

[7] DNZ maintains that it cut ties with the Ma'anshan facility in May 2011. *See* Dong Declaration, [368-2] at 14 ¶ 38. But the fiber products sent to Federal-Mogul through Seamarky (and thus from Ma'anshan) were packaged in bags marked with DNZ's website. *Compare, e.g.*, [336] at 6 *with* http://www.dnz-inc.com/ (last visited September 12, 2016); *see also* September 17, 2012 E-mail from Delano Mok to Kenney York et al., [344] at 2 (directing a potential customer to look at www.dnz-inc.com for more information about DNZ's fiber products). Moreover, Dong Jue Min agreed at his deposition that the person who had completed various "quality analysis reports" appended to Seamarky shipping notices in 2011, 2012, and 2013, *see* [326] at 8–13; [327] at 8–10; [328] at 7–10, was a DNZ employee, [304] at 27, Tr. at 154:18–:22. (Though Dong also stated that he believed this employee, like Chan, had left DNZ within 12 months of when GMT filed suit. *Id.*, Tr. at 154:23–155:8.)

say that they have broken ties completely with each individual (and the manufacturing facility) potentially linking defendants to Seamarky's activities, but offer no documentary proof in support of this assertion. Nor does their explanation of what happened—that defendants' former employees and agents set up Seamarky themselves and used the "DNZ" mark to sell product from the Ma'anshan plant without any continued connection to or permission from DNZ—make sense. Defendants claim that these "former" employees stole the DNZ brand, and also claim that defendants were shutting down DNZ because of GMT's accusations. But the DNZ brand would not have been worth stealing if, as defendants claim, their reputations had been so damaged by GMT's accusations that in early 2011 they were forced to start closing down their operations. *See* March 2015 Letter to Judge Kim, [197] at 1, 3; Dong Declaration, [368-2] at 13–14 ¶ 38.[8] In addition, Tru Group is a defendant here and its claim to have no connection to Seamarky is flatly contradicted by the instructions to a customer to send money for Seamarky to a Tru Group bank account. The simpler, and more likely true, explanation is that DNZ and Tru Group had some relationship with Seamarky, and defendants falsely denied the relationship's existence.

---

[8] Defendants' claim that they have ceased all manufacturing operations is also suspect. In addition to the evidence discussed above, DNZ's website—last updated in October 2015, *see* [346] at 2—indicates that the company is still making product. *See also* http://www.made-in-china.com/showroom/dnzfibre/companyinfo/Dazheng-Metal-Fibre-Co-Ltd-.html (showing February 2016 as the most recent log-in date for DNZ's account with Made-in-China.com, an online facilitator of trade between Chinese suppliers and buyers worldwide) (last visited September 12, 2016).

### 3.    *Other Discovery Violations*

GMT contends that defendants DNZ and Tru Group have also violated Federal Rule of Civil Procedure 30(b)(6) by selecting as a representative deponent only Dong Jue Min, who was either unprepared to answer, or in certain instances refused to answer, questions relating to the noticed deposition topics—topics to which neither defendant company ever objected.

Some of Dong's deposition testimony was indeed bizarre.[9] When asked if there existed written records or minutes of DNZ board meetings, Dong responded that he had no obligation to provide GMT's counsel with any such information, because GMT was not one of DNZ's shareholders. Deposition of Dong Jue Min, [304] at 17, Tr. at 106:6–:19.[10] Although Dong ultimately gave an answer to the question (no, there were no meeting minutes), he then clarified that the *reason* he had answered "no" was because GMT was not a shareholder of DNZ. *See id.* at 18, Tr. at 109:6–110:8. Dong gave similar responses to questions concerning DNZ's production of documents to GMT, *see id.* at 26, Tr. at 150:16–151:4, and about the creation of Tru Group, *see id.* at 20, Tr. at 116:2–:10 ("Q. [W]hen did [the board] resolution

---

[9] In response to GMT's motion for default, and in support of their own motion for summary judgment, defendants have filed errata sheets for Mr. Dong's deposition. *See* [368-81]. GMT moves to strike these errata as untimely, and because they change substantially the meaning of Dong's testimony. *See* [369]. The motion is denied. Whether or not the errata were timely, I refer in this opinion to only four lines of the testimony affected by the proposed revisions (those at transcript pages 57, 110, and 116), and those changes are minor. They do not alter in any significant way the import of what was transcribed at the deposition. *Cf. Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 488 (7th Cir. 2008) (explaining that the district court should consider whether a change in testimony is plausible).

[10] GMT claims that it does own a part of DNZ. Defendants disagree based on a December 2014 ruling by the Chinese court, which is not at issue here.

occur for the approval of TruGroup . . . ? A. This is internal information of DNZ. Like I said many times before, . . . you have no rights [*sic*] to ask a question in regards to our internal operations[, and] I have no . . . obligations [*sic*] to answer these questions."). Whether GMT has an ownership interest in DNZ does not inform the parties' rights or obligations at a deposition. And having neglected to object to the scope of any of the noticed deposition topics—which included the subjects just discussed, *see* [354] at 8 ¶¶ 1, 10; *id.* at 11 ¶ 44—Dong was required to speak to those issues unless the information sought was either privileged or subject to a work-product protection (and defendants make no such argument here).

Dong was also unable to answer questions about Jenny Shi and Julia Wu, the declarants for DNZ and Tru Group, respectively (as discussed earlier); nor could he speak to the contents of the declarations. *See* Dong Deposition, [304] at 7–8, Tr. at 51:24–53:12, 57:8–:17; *id.* at 13, Tr. at 78:18–80:16. These topics, too, were covered by GMT's 30(b)(6) deposition notices. *See* [354] at 8 ¶¶ 6–7; [355] at 8 ¶¶ 6–7. Dong claimed to be unfamiliar with Alex Chan. *Compare* Dong Deposition, [304] at 27–28, Tr. at 152:2–:6, 156:16–158:2 (stating that Dong did not know who that person was) *with* GMT's Amended Rule 30(b)(6) Deposition Notice to DNZ, [354] at 11 ¶¶ 47–48 (listing as 30(b)(6) topics all communications by and between DNZ and Alex Chan, and communications sent by Alex Chan on DNZ's behalf) *and id.* at 8 ¶ 6 (listing as a topic all information contained in Jenny Shi's declaration); Shi Declaration, [183-1] at 2 ¶¶ 3–4, 6 (discussing Chan's relationship with DNZ and the search of his DNZ e-mail account). And Dong said he had little to no information about Tru

Group's operations or related documents, because Tru Group had "contracted out" its management to another party. *See* Dong Deposition, [304] at 22–23, Tr. at 125:5–131:6.

That Tru Group (the defendant for whom Dong testified as a 30(b)(6) representative) had absolutely no knowledge of or control over its own documents is improbable—especially considering that the individual to whom Tru Group claims to have entrusted its management was not a disinterested third party, but Grace Xie, the DNZ marketing manager (and a DNZ employee). *See id.* Moreover, as Dong stated in his March 2016 declaration (filed in response to the present motion and in support of defendants' motion for summary judgment), Tru Group *did* have possession of some of its operational records. [368-2] at 15–16 ¶ 45. Both Tru Group and DNZ, explained Dong in his declaration, had had policies of preserving in hard copy all "important" information, including all documents concerning the export of DNZ's products. *Id.* The physical records had been maintained at the companies' respective offices until the businesses purportedly ceased operations, at which time those documents were moved to an archive room at DNZ. *Id.* According to the defendants' March 2015 letter to Judge Kim, Tru Group stopped exporting goods for sale in September 2011, and both Tru Group and DNZ discontinued all operations in 2013. *See* [197] at 1, 3. So defendants had possession of Tru Group's records no

later than 2013. Dong Jue Min was not deposed until 2015—at which time he claimed to be totally in the dark on this point.[11]

As for Dong's ignorance of Alex Chan and the rest, defendants argue that Dong did not speak English (and so did not recognize any of the English names that DNZ or Tru Group representatives may have adopted). He was the person most qualified to represent those companies at the deposition, argue defendants, and he answered GMT's questions as best he could. Defendants confuse the deposition of a business entity with the deposition of an individual. Individuals may testify only to their personal knowledge; but company representatives designated under Rule 30(b)(6) must also be prepared to testify about any information "known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). If a single person is unfamiliar with such information, or cannot be so educated before the deposition, the company must select additional designees to testify. *See id.* ("The named organization must . . . designate *one or more* officers . . . or designate other

---

[11] GMT also complains that it still has not received all of defendants' financial documents, which Dong testified that the defendants did have (and the production of which GMT requested on more than one occasion). *See* Dong Deposition, [304] at 23, Tr. at 130:1–:2, 131:7–:24; October 19, 2014 E-mail from Jonathan Goodman to Eugene Meyers et al., [356] at 4. (At one point in his deposition, Dong testified that there was only one record documenting the financial relationship between Tru Group and DNZ, which had already been produced. *See* [304] at 19, Tr. at 113:11–114:1. But Dong later referred to accounting records, plural, addressing that issue. *See id.* at 23, Tr. at 131:15–:20.) In addition, says GMT, defendants have refused to produce copies of all of the documents Dong had with him, and to which he referred, during his deposition. *See* October 22, 2015 E-mail from Goodman to Meyers et al., [356] at 4 (reiterating GMT's request for production of those documents). Defendants did turn over a copy of one such document, *see id.* at 3, but GMT maintains that the copy produced was not a copy of the document actually used by Dong, and in any event he had more than one document with him at the deposition, *see id.* at 2. Dong's evasiveness on these points undermines defendants' credibility, and lends more support to the notion that defendants willfully dodged the facts being explored in discovery.

persons . . . to testify on its behalf.") (emphasis added). The rule is structured in this way to prevent the kind of "bandying" that may occur when the officers or agents of a business entity are deposed in turn and each disclaims knowledge of facts that are clearly known to persons in the company (and, thus, to the company itself). Advisory Committee Note to 1970 Amendment to Fed. R. Civ. P. 30.

Someone at DNZ definitely knew who Alex Chan was, because they provided information about him in a sworn declaration submitted to the court. And there is no excuse for Dong's professed unawareness of the contents of that declaration, or its declarant, as DNZ was given notice that these subjects would be addressed at the deposition. The declaration submitted by Tru Group was similarly included as a topic for discussion with that company's 30(b)(6) designee. Dong may not have spoken English, but the deposition notices were sent on June 29, 2015, *see* [354] at 4; [355] at 4—four months before the first of two 30(b)(6) deposition sessions. (Dong was first deposed as a 30(b)(6) witness on September 29, 2015; he was deposed again under Rule 30(b)(6) on December 9 of that year.) There was plenty of time in which to have had the notices translated, to have investigated the noticed topics, and, if Dong was unfamiliar with some of the names or terminology contained in those topics, to have filled him in or selected additional representatives to testify if needed. *Cf. Black Horse Lane Ass'n, L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 304 (3d Cir. 2000) ("[T]he purpose behind Rule 30(b)(6) . . . is frustrated [when] a corporate party produces a witness who is unable [or] unwilling to provide the necessary factual information on the entity's behalf. . . . [P]roducing an unprepared witness

[under Rule 30(b)(6)] is tantamount to a failure to appear that is sanctionable under Rule 37(d).") (citations and internal quotation marks omitted).

### 4.    *The Appropriate Sanction*

"Default judgment is strong medicine for discovery abuse." *Domanus*, 742 F.3d at 301. But there are some types of misconduct that place too high a burden on allowing the case to continue, *see Dotson v. Bravo*, 321 F.3d 663, 665 (7th Cir. 2003) (quoting *Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993)); and defendants' conduct here is egregious enough to warrant the requested sanction.

Defendants disposed of DNZ's computers while the lawsuit was pending, and neither the claim that the information on those computers was irrelevant to the litigation, nor defendants' explanation for having liquidated the computers in the first place, is credible—the defendants acknowledged that relevant information existed on the computers at some point and the defendants did not truly cease operations.[12] Defendants also sat on the e-mail account of a key custodian (and named defendant), Dong Jue Min, until GMT complained about the paucity of defendants' production; then they pointed to the "surprise" deletion of the account as an excuse for not having searched it. This is no excuse at all. Not only was the erasure of the e-mail messages not a surprise—Yahoo! had informed its customers of the pending deletion months in advance—but defendants had had nearly two

---

[12] Magistrate Judge Kim was slightly more charitable when he characterized defendants' explanations about whether they in fact stopped doing business as "disturbingly murky" and "vague and shifting." *Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co.*, 133 F. Supp. 3d 1079, 1086 (N.D. Ill. 2015). But he also noted that defendants misled him by conveying a false impression in their March 2015 letter. *Id.*

years in which to search Dong's account before it disappeared. As to Delano Mok's e-mail account, defendants swore in a filing with the court that they had searched the account, then reversed course and represented to Judge Kim that in fact they had never searched it at all because they had never been given access.

In short, defendants lied. Their dishonesty leads me to conclude that, when defendants discarded one source of electronic evidence and failed to preserve others, they did so deliberately and in order to prevent GMT from obtaining that evidence and using it against defendants in the litigation. That defendants were acting in bad faith is further demonstrated by their stubborn failure to comply with their 30(b)(6) obligations, and by their assertions about Seamarky. All three defendants have disclaimed any kind of relationship with the Hong Kong-based supplier—seemingly in an effort to explain (or justify) the lack of references to that company in the materials defendants did produce to GMT—but the records and deposition testimony provided by GMT's former customers sing a different tune. And, contrary to defendants' assertion, evidence tying defendants to Seamarky is relevant to GMT's trade-secrets claim—so lying about the connection is a willful act directed at this litigation.

To prevail on the trade-secrets claim, GMT must show that defendants misappropriated a "trade secret"—that is, information that: (1) was sufficiently secret that its holder could derive economic value from its not being generally known to others; and  (2) was "the subject of efforts that [were] reasonable under the circumstances to maintain its secrecy or confidentiality." *Learning Curve Toys,*

*Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003) (quoting 765 ILCS 1065/2(d)). The second requirement is satisfied only where the plaintiff has taken affirmative measures to prevent others from using its proprietary information. *See id.* at 722 (citing *Jackson v. Hammer*, 274 Ill.App.3d 59, 653 N.E.2d 809, 816 (1995)); *see also Alpha School Bus Co., Inc. v. Wagner*, 391 Ill.App.3d 722, 740 (1st Dist. 2003) (explaining that, in determining whether a plaintiff's information was a "trade secret," the most important consideration is whether and how the information was kept secret). GMT maintains that it did take such measures, which included obtaining from DNZ an agreement of confidentiality and a corresponding promise not to approach any of GMT's customers. The parties never executed a written confidentiality contract, however, so the agreement, if there was one, was oral.

Direct evidence of an oral confidentiality agreement—the recollection of GMT's representative that he reached such an agreement with Dong Jue Min—is disputed by Dong, who says the agreement never happened. But circumstantial evidence, too, may be used to show that an agreement existed, and such evidence could include proof of a connection between DNZ and Seamarky. According to GMT, DNZ secretly created Tru Group—and then, once GMT learned of that connection, secretly created Seamarky—in order to snatch up GMT's customers and sell to them products manufactured using GMT's techniques. There would be no reason to do these things in secret, however, unless defendants thought by engaging in such

conduct they were crossing a line they were not supposed to cross—a line created, for instance, by a promise of confidentiality to GMT.[13]

Defendants make little argument in response to GMT's evidence of misconduct, except to say that Judge Kim has already resolved this issue (he has not); that defendants did satisfy their discovery obligations (they did not, as just explained); and that GMT has not shown any prejudice from the alleged loss of evidence. A specific finding of prejudice is not required under Rule 37(e)(2) once the court has found, as I have here, an intent by the party who lost or destroyed the evidence to prevent the other party from using it in the litigation. *See* Advisory Committee Note to 2015 Amendment to Fed. R. Civ. P. 37(e). A specific finding of prejudice is not required in such cases because the finding of intent to deprive the other party of the use of certain information also supports the inference that the missing information was unfavorable to the party that destroyed it—and thus the further inference that the party who now cannot use the lost evidence has been prejudiced by that loss. *Id.*

For the reasons discussed above, I find that defendants' discovery violations were willful and the product of bad faith. Default judgment is a harsh penalty, and litigation ordinarily ought to be resolved on the merits, but the sanction is appropriate here. Lesser sanctions—for example, an instruction permitting or

---

[13] There is evidence that DNZ told GMT that DNZ was going to sell product directly to overseas customers, and from this evidence, defendants argue that there was no "secret" about Tru Group or Seamarky. But defendants did hide their connection to Seamarky—and to this day, refuse to acknowledge it. Moreover, there is evidence that DNZ promised not to go after GMT's customers, so there was reason to keep secret those kinds of efforts even if GMT knew DNZ might be competing in the marketplace generally.

requiring the jury to infer that the information from the lost computers and now-unavailable e-mail accounts was favorable to GMT—would not adequately reflect the seriousness of defendants' wrongs. Defendants were not merely dilatory or misleading by omission in their litigation tactics; they were affirmatively deceitful, to GMT and to the court. Giving false information or a false impression to the court in the hopes of obtaining a benefit in the litigation is a most egregious offense, as it "undermines the most basic foundations of our judicial system." *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015); *cf. Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Ams. LLC*, 516 F.3d 623, 626 (7th Cir. 2008). While an adverse-inference instruction, or a prohibition on introducing certain types of evidence, might level the playing field between the litigants, those sanctions would not be sufficient to punish defendants for their dishonesty. Defendants falsely told Magistrate Judge Kim that they liquidated their computers as part of a business wind-down and that Dong's emails were surprisingly lost. They then willfully dodged other efforts to investigate the case by falsely claiming no connection to Seamarky and intentionally avoiding their obligations under Rule 30(b)(6). The abuse of the litigation process was serious enough to bar defendants from denying liability to GMT on its trade-secrets claim.

This sanction does not, however, change the disposition of the other claims in this case. The recognition of DNZ's Chinese-court judgment and its preclusive effect against GMT remains in place. *See* [208]. The dismissal of other claims by GMT,

[136], is also not revisited. Finally, the sanction of default does not fix the amount of damages, and GMT remains obligated to prove its damages.[14]

### B.  Defendants' Motion for Summary Judgment

Because the motion for default is granted, defendants' motion for summary judgment is denied as moot.[15] GMT's motions to strike defendants' Local Rule 56.1 statement, [373], and to strike Dong Jue Min's declaration, [371], are likewise denied.

### IV.  Conclusion

Plaintiff's motion for default judgment, [299], is granted. An order of default is entered against defendants on plaintiff's trade-secrets claim, with the amount of damages to be determined in additional proceedings. The disposition of the other, resolved claims in this litigation is unchanged. Plaintiff's motion to supplement the record, [385], is denied. Defendants' motion for summary judgment, [367], is denied

---

[14] GMT's motion to supplement the record on its motion for default, [385], is denied. The conduct described in the motion to supplement targets an attorney for defendants, and is not related to the electronically stored information that is the basis for GMT's Rule 37(e) motion. The latter is granted without considering the evidence GMT seeks to add with its motion to supplement.

[15] On the merits, defendants' motion for summary judgment would be denied. While they have reasonable arguments that GMT has not identified its trade secret with specificity and the alleged secrets were not actually confidential, defendants have not established that they are entitled to judgment as a matter of law. There are factual disputes over the promise of confidentiality, and the scope of the customer information that may have extended beyond routine, non-secret industry information. Particularly with respect to the process of making high oil-content fibers to satisfy customer requirements, GMT has pointed to evidence suggesting that it spent time, effort, and money to derive economic value from information that could not be easily duplicated by others. This is sufficient to defeat summary judgment. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) (the existence of a trade secret is ordinarily a question of fact).

as moot. Plaintiff's motions to strike, [369], [371], and [373], are denied. A status hearing is set for 10/7/16 at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date: 9/13/2016